# CHARLESTON.

## STATE *v.* DOUGLASS.

Submitted September 17, 1895—Decided Dec. 7, 1895.

1. INDICTMENT—DEGREES OF MURDER.

    The form of indictment for murder, in section 1 of chapter 144 of the Code, again held good for conviction of murder in the first or second degree or any lower grade of homicide.

2. CRIMINAL LAW—CHANGE OF VENUE—FAIR TRIAL.

    An affidavit for change of venue must state facts and circumstances from which the conclusion is deduced that a fair trial can not be had, and not merely opinion that it can not, and the court must be satisfied from those facts that he can not or may not get such fair trial, and not from conclusions or opinions of the defendant or his witnesses.

J. W. ARBUCKLE and W. P. RUCKER for plaintiff in error. J. W. ARBUCKLE cited Minor, Crimes & Punishments, 253; 2 Gratt. 629; 3 Gratt. 690; 5 Gratt. 664; 14 Gratt. 675; 18 Gratt. 785; 18 Gratt. 915; 19 Gratt. 807; 20 Gratt. 825; 25 Gratt. 974; 15 Gratt. 664; 77 Va. 53; 22 Am. Dec. 767; 10 Am. & Eng. Enc. Law, 544, note, 566-67, notes; 45 Ind. 338; 44 Tex. 473; 1 Tex. 417; 10 Mich. 212; Code, c. 144, s. 1; 4 Leigh, 669; 22 W. Va. 800; 1 Burr's Trial, 416; 4 Wend. 232; 9 Pick. 99; 2 Va. Cas. 375; 24 W. Va. 782; Const. Art. III, s. 5.

ATTORNEY-GENERAL T. S. RILEY for State, cited 26 W. Va. 116; 24 W. Va. 767, 814; 22 W. Va. 800; 33 W. Va. 319; 28 W. Va. 297; Code, c. 144, s. 1.

BRANNON, JUDGE:

This is a writ of error brought by Kenos Douglass to reverse a sentence of imprisonment for life in the penitentiary imposed upon him by the Circuit Court of the county of Greenbrier for the murder of Thomas Reed on Christmas night, 1893.

Counsel for the prisoner asks us to hold bad the indictment, which is in the form allowed by section 1 of chapter

68

144 of the Code, the particular defect suggested being the omission to charge the homicide as having been done with premeditation, as one of the essential elements of murder in the first degree.  As was said in *Baker's Case,* 33 W. Va. 330 (10 S. E. 639) we regard the indictment good under several decisions there mentioned, and will not reopen its discussion.   It has been so long used and so often approved that the matter ought to have rest.

The refusal to allow a change of venue is relied on as error.  The statute requires the accused to show good cause for it.   This means that he must show it to the satisfaction of the court.   *State* v. *Greer,* 22 W. Va. 800.   To maintain his motion numerous affidavits were filed—all, I may say, alike in substance—stating that the affiants had heard the case much talked about in the county, and that there was a strong prejudice against Douglass, and that, in the opinion of affiants, a fair and impartial trial could not be had in Greenbrier county.   Are these affidavits, taken alone, without reference to the counter affidavits filed by the state, sufficient to show that the circuit court abused the discretion lodged with it ?   They show what ? *First.* That the case was much talked about.   This is only a basis of opinion that prejudice existed.  *Second.* That there was prejudice, which could only be matter of opinion.   *Third.* That in the opinion of affiants a fair trial could not be had.   Now, this all amounts but to an expression of opinion that a fair trial could not be had. There may be public discussion of a case.   There always is of murder cases.   There may be prejudice—generally is; but is it so prevalent and widespread that, in spite of the safeguards which the law throws around trials, it may— there is serious danger that it may—prevent a fair trial? No facts are given affording a basis of judgment as to whether such trial can be had.   Opinions differ so widely. They spring, with different men, from so many different theories, conjectures, bias, partisanship, or solid ground. There must be facts and circumstances so that legal deductions can be made.   In *Wormsley's Case,* 10 Gratt. 658, the evidence showed much more than here, and was held insufficient, and the rule stated that the prisoner's affidavit,

alone, of a fear or belief that he could not get a fair trial was insufficient, and that there must be independent testimony to show facts making it appear probable, at least, that his fears and belief are well founded. 1 Bish. New Cr. Proc. § 71, cl. 5, correctly states the rule: "The venue will not be changed for the mere belief of the party or his witnesses that he can not have a fair trial in the county. Facts and circumstances must appear satisfying the court." So long ago as 1817 the Virginia general court adopted a general rule that in future, in all motions to change the venue, the petition and affidavit "shall set forth the particular facts from which the petitioner is induced to believe that he can not have a fair trial in the county." 2 Va. Cas. 88. In *Territory* v. *Egan*, 3 Dak. 119, (13 N. W. 568) it is held that the affidavits "must state the facts and circumstances from which the conclusion is deduced that a fair and impartial trial can not be had. The court must be satisfied from the facts sworn to, and not from the conclusions to which the defendant and his witnesses may depose," In *Salm* v. *State*, 89 Ala. 56 (8 South. 66) it is held that opinions of witnesses *pro* or *con* that a fair trial can or can not be had are worthless, unless supported by sufficient reasons, testified to as facts. The same rulings will be found in *People* v. *Bodine*, 7 Hill, 147; *State* v. *Burris*, 4 Har. (Del.) 582; *People* v. *Yoakum*, 53 Cal. 566. It is clear that the prisoner's showing did not entitle him to a change of venue. But affidavits were filed by the state denying the existence of a prejudice against Douglass to an extent at all militating against a fair trial, stating that the excitement incident to the murder had abated, as also the feeling against him, and that he could, in the opinion of affiants, have a fair and impartial trial, and that those who made the affidavits for the prisoner were residents of the immediate vicinity of the place of the homicide, and even there sentiment was divided, as the prisoner had partisans there, but that other sections of the large county of Greenbrier, composed of eight districts, were unaffected by prejudice. These affidavits conveyed the opinion of an ex-sheriff, the sheriff, and two deputies, and the prosecuting attorney, who were extensively acquainted with all parts of the county.

Another point made in behalf of the accused is that the jury included improper jurors. These jurors did say that they had made up opinions adverse to the prisoner; but their opinions were not from having heard evidence—not even from conversations with witnesses in the case—but from the talk or rumor of the county, or from reading the Greenbrier Independent, and each and all stated definitely that they had no bias or prejudice against Douglass, that they could and would have their minds blank and free from such opinions, and could and would give the prisoner a fair and impartial trial, uninfluenced by such opinions, according to the evidence. This Court has so often considered the question of the competency of jurors that it would be a sheer waste of time to rediscuss the subject here. Unless we upturn numerous decisions heretofore made, these jurors were free from legal exceptions. *State* v. *Baker*, 33 W. Va. 319 (10 S. E. 639) and cases cited.

Ought the circuit court to have given the prisoner a new trial because the verdict was unsustained by the evidence? I will not detail the pages of evidence. Thomas Reed had a chopping Christmas day, and invited his friends to his cabin home in the mountains to participate in plays usual among the mountaineers on such occasions. Kenos Douglass had not helped at the chopping; and was not invited. He organized a company of five, he being one, and went to Reed's party, several miles away. He commanded the company. He openly exhibited a pistol along the way. The whole evidence shows that he, at least, designed to create disturbance at the party and carry things on in his own way. He and his companions were kindly invited in at Reed's. Scarcely had he entered than he started a fuss with a young boy, Creed Reed, a brother of Thomas Reed, by boisterous, insulting language, laying his hand on his breast, and pushing him back. Another brother, Johnson Reed, remonstrated with Douglass, saying, "Kenos, that is my brother, and you must not hurt him; he is too young," and he replied that he had things to go on as he said, swearing as he said this. Then he and a companion started a play of their own, represented as rough, which Thomas Reed did not like, but let them finish it and then said,

"You must go out of my house, if you please." Evidence shows that Douglass used both profane and obscene language in the company of ladies and gentlemen. Thomas Reed did nothing more during this attack on his brother than to say to Douglass he wanted no swearing, and Douglass said he would do as he damned pleased. Then Douglass drew a pistol, and defiantly and threateningly snapped it two or three times, pointing it at a bed in which two children were sleeping, and a few moments later fired the pistol into the loose board ceiling. Not an insulting word had been given him by the deceased. When the pistol was fired a good many left the room, and then Douglass walked out the open door, and Thomas Reed, without weapon or assault or threat, but evidently to close the door (it may be, fearful that Douglass would fire into the house) followed him across the small room, and, it may be, but it is not certain, put his hand on Douglass' shoulder just as he went out of the door, but surely used no violence, and then closed the door, when, instantly, as the door was closed, a shot was fired through the panel door and penetrated Reed's body, causing his death next day.

Who fired this deadly shot? None other than Kenos Douglass. No one else had had the slightest word out of the way with Reed. He was the only one seen with the deadly pistol. Just as the door closed, he on its outside, Reed on its inside, before either had time to get away, came the shot. Some say he had the pistol still in hand as he passed the door sill. From whose pistol this deadly bullet? Were there no other evidence, these circumstances would be full proof to reasonable men that he fired the fatal bullet. He was intent on mischief, as his conduct shows. He was intent, it seems, on taking Reed's life. He was afraid to fire in the room before all eyes, and thought it safer to fire from the outside; but he was careful to fire at once, before Reed would leave the knob of the door, and pointed his pistol at just the proper place to kill Reed. He was so close that the powder burnt the door. Reed's dying declarations to his father, Elijah Reed, accuse Douglass. His father was at his bedside when the wounded young man said, "Pa, I don't want you to grieve for

me; I am bound to die," showing the deadly wound. The father asked him, "Tom, do you know who did it?" and he answered that Kenos Douglass did it, and that it was hard for a man to be shot in his own home, trying to keep order in his own house. So strong were the circumstances, that Reed knew whose finger pulled the trigger. There was no room for a mistake on his part. The circumstances were too close and forcible.

A witness for the defense, Robert Taylor, says he heard a woman's voice outside the door say, "Lordy, Kenos don't shoot," and he replied, "Damned if I don't," and then the shot. Richard Humes and Gordon Falconer say they saw Kenos Douglass fire that shot. Thomas and Miranda Cochran heard Douglass say that night that he would not have shot Reed if he had not shoved him from the door. Did Douglass go into the stricken man's house, like many others, to minister what comfort he might to him and his wailing wife? He did not. Did he go home and await the coming of the officer of the law in the consciousness and courage of innocence? He did not. Whither did he flee? From home and the haunts of men to the recesses of the wildest mountains of the state, and in midwinter for five weeks lay in a laurel brake hiding from the eyes of man, never going to a human habitation, and there he was surprised while asleep by a vigilant officer of the law.

As a jury has said he is guilty of murder in the first degree, we could not say otherwise, unless their finding be plainly, manifestly against or without evidence, so as to assault the conscience as a verdict of palpable injustic; but that verdict is sustained by abundant evidence. The jury showed mercy in not making Kenos Douglass pay the forfeit of his life for the life of Thomas Reed, under the law of the Bible. We would fain somewhat palliate the enormity of this act by attributing it to haste and recklessness of intoxication, but I regret to believe that it is only a cruel, unprovoked murder of a man without fault, within the sacred precincts of his humble home, by one who invaded that home bent on mischief to some one there, certainly; bent, likely, on taking the life of Thomas Reed. Men intend what they do. I repeat that I would gladly at-

tribute the act to intoxication; but while the use of liquor in Douglass' party is mentioned, it was before they came to Reed's, and no one says that Douglass was to any extent intoxicated there. The signs point, as above stated, to sedate design. It appears he did not like the Reeds. He seems to have intended to break up and discredit the entertainment. He did so, as Thomas Reed said, when Douglass had so misbehaved, that they would have to close the playing. A bad feature in this connection is that Sally Dancey stated on the stand that on the 16th of December, at Trout Valley, Douglass, at a store, asked twice, before any one answered, where Tom Reed was, and she answered that he was out in town, when Douglass jumped up and ran towards the door, saying, "Boys, I am practicing for Christmas, and if you don't believe it," pulling back his coat, disclosing a strap around his shoulder. This witness said she could have seen what was on the strap, if she had been standing where Bernard McClung was. The defense calls from the night's shadow a humpbacked, limping old man, wearing a long overcoat, brings him to Reed's door just in the nick to make a point, and then the shot, and then this figure disappears back into the night. Whence and whither came and went he? No one knows. No one recognized him. Neither did the common-sense jury. That body must have regarded him as a thin, ethereal being, born of fiction, inspired by the superstition surrounding such a night tragedy, or as the child of perjury, but dematerializing under the light of common sense and truth. One witness makes this old man anxious to know the fate of his victim, by making him return towards Reed's and inquire as to his condition. This must be attributable to remorse and repentance. It could not be that he was returning to see if he was safe from suspicion, as he had come and gone utterly unrecognized and unrecognizable. He was a myth. No doubt unfortunate Kenos Douglass would give the world, if he possessed it, to recall that deadly shot, and we can not but feel sincere pity for him, a young man less than thirty years of age, resting under the terrible doom of imprisonment within iron doors which will never open for him; but appeal courts can not pardon these terri-

ble crimes against life and organized society when a jury of the man's peers, who have looked him and his accusers in their faces, and fairly heard his cause, have pronounced him guilty.

We therefore affirm the sentence.