# CHARLESTON

## STATE v. CLIFFORD.

Submitted January 11, 1906.   Decided February 6, 1906.

1. LIBEL AND SLANDER— *Words Actionable Per Se.*
     Words imputing want of chastity to a woman are actionable *per se.*  (p. 685.)

2. ARGUMENT OF COUNSEL—*Instructions— Waiver of Error.*
     In order to warrant the appellate court to revise errors predicacated upon the abuse of counsel of the privilege of argument, it should be made to appear that the party asked and was refused an instruction to the jury to disregard the improper statements of counsel.  (p. 686, 687.)

3. CONVERSATION WITH JUROR—*Remarks to Juror not Prejudicial.*
     When it clearly appears from the record that the plaintiff in error could not have been prejudiced by a remark made to a juror during the course of the trial, the verdict should not be set aside because of such remark.  (p. 688.)

4. SYLLABUS APPROVED.

Syllabus, point 2, *State* v. *Williams*, 14 W. Va. 851, re-affirmed. (p. 689.)

Error to Circuit Court, Berkeley County.

J. R. Clifford was convicted of libel, and brings error.

*Affirmed.*

FAULKNER, WALKER & WOODS, for plaintiff in error.

C. W. MAY, Attorney General, for the State.

MCWHORTER, PRESIDENT:

At the April term of the circuit court of Berkeley county, the grand jury of said county returned into court the following indictment:

"The Grand Jurors of the State of West Virginia, in and for the body of the county of Berkeley, and now attending the said court, upon their oaths present, that on the 3rd day of June, A. D. 1899, one J. R. Clifford, of the County of Berkeley aforesaid, was one of the proprietors, editors and publishers of a newspaper, published and printed at Martinsburg, in said County of Berkeley, State of West Virginia aforesaid, called and known as The Pioneer Press; that said J. R. Clifford, in an article and writing published by him in said newspaper, unlawfully and maliciously contriving to injure and villify one Hattie R. Newman and to bring her into public scandal, contempt, ridicule and disgrace, then and there, to-wit: on the said 3rd day of June, A. D. 1899, at Martinsburg, in the said County of Berkeley, and State of West Virginia, aforesaid, did publish in said newspaper aforesaid, called and known as The Pioneer Press, and circulate in said County, a false, scandalous, malicious and defamatory libel of and concerning the said Hattie R. Newman, containing divers false, scandalous, malicious, and defamatory matters and things, of and concerning the said Hattie R. Newman, (all of which matters and things were published in the said Pioneer Press, in a single article and editorial, on the said 3rd. day of June, A. D. 1899) of the tenor following to-wit:

'I shall introduce him.'

'Rev. (?) J. C. Newman of Hagerstown, Md., and who is set up as one of the stars of the first magnitude of the Free Baptist Church of the Shenandoah Valley, has made it a spe-

cial object to pray for us at Storer College on several anniversary occasions. Last Thursday he stood on the rostrum batting his eyes like a toad in the ashes, shaking and ducking his shallow head and begging the Lord to have mercy on us.

Now, we want it distinctly understood, that we want none of his prayers, for they can only add damnation to our soul, if they add anything, because he himself is damnable, and if his religion, the life he has led, and his prayers, can land him in heaven, we prefer to go to the other place.

Since he has been blabbing in the pulpit, we have seen him skulking in the bushes with a noted prostitute, and without following him down, a transaction took place only a few weeks ago, that ought to make the devil blush, but John don't seem to care about it. It is said, and no one has denied it, that he (meaning the said John C. Newman) went into his own house and found a man, by the name of Baum and his wife, (meaning the wife of the said John C. Newman, viz: the said Hattie R. Newman) playing the dog. (Meaning that the said Baum and the said Hattie R. Newman, were then and there engaged in the criminal act of sexual intercourse they not then and there being lawfully married to one another, and that said sexual intercourse was then and there being done and performed by them as sexual intercourse occurs and is performed by and between a male and female dog.)

Both he and Newman's wife being teachers at the time, a public investigation took place, and Baum declared that Mrs. Newman (meaning the said Hattie R. Newman) had frequently been 'start naked' before him (meaning that she, the said Hattie R. Newman, had neither clothes nor covering of any kind on or about her person at the times he, the said Baum, had seen her and had frequently thus exposed and shown her person to the said Baum) and to prove it, told how many scars she had on her person. Hagerstown never had a more disgraceful affair, for so much of which can't be told in print. But to show what kind of fellow John C. Newman is, he came to Martinsburg a few Sundays after it occurred in company with his wife, (?) (meaning that there was some question and doubt as to the said Hattie R. Newman being the lawful wife of said John C. Newman, and that they

were living together presumably as man and wife, instead of being lawfully married to one another) and he preached (?) and she played and sung in the church, and so they live to demoralize the young under the guise of religion. Who blames an editor for objecting to such a moral leper and melodorous scamp as John C. Newman, praying for him in public? There is no place in hell hot enough for such dirty scoundrels; but there will be nothing done about it in the Free Will Baptist denomination of this Valley, because he is too good a lackey. May God Almighty soon deliver the race of devils in the pulpit, and let our children have better examples.

While his wife (?) (meaning that there was some question and doubt as to the said Hattie R. Newman being the lawful wife of the said John C. Newman, and that they were living together presumably as man and wife, instead of being lawfully married to one another,) is black in character, John C. Newman is blacker, because he feigns to be a preacher, and is too low himself to put his foot on such rotten conduct, for well does he know that it would be kettle calling pot black.'

To the great scandal, injury and disgrace of the said Hattie R. Newman, and against the peace and dignity of the State.''

The defendant demurred to the indictment, which demurrer was overruled. At the September term, 1901, the case was tried upon the plea of ''Not Guilty'' and a verdict of ''Guilty'' returned by the jury. The defendant moved in arrest of judgment to set aside the verdict and grant him a new trial, which motions were also overruled and judgment entered for a fine of $100 and cost of prosecution, and further provided for imprisonment for defendant in the Berkeley county jail until the fine and costs should be paid, for a period not exceeding sixty days. The defendant gave bond under section 10, chapter 36, Code.

Upon the trial the defendant took four bills of exceptions, numbered 1, 2, 3 and 4, respectively, and procured from one of the Judges of this Court a writ of error and *supersedeas.*

The first assignment of error is the overruling of the demurrer to the assignment, claiming that ''The indictment is

not sufficiently explicit in as much as it did not inform the defendant as to what specific portions of said articles were complained of." The indictment seems not to include anything as applying to the husband of Hattie R. Newman, the J. C. Newman mentioned in the indictment, but the prosecution is for defaming the name of Hattie R. Newman only. The entire article is set out in the indictment and the parts relied upon are brought to notice by innuendoes which sufficiently set out the statements relied upon and gives the defendant notice of what he is expected to answer. In *State* v. *Aler*, 39 W. Va. 549, (Syl. pt. 2), it is held: "It is an elementary rule of pleading that whatever is alleged must be alleged with certainty, and one of the means of insuring certainty in a complaint or indictment for slander or libel is innuendo." Point 3 of the same case holds: "An innuendo may serve for an explanation to point a meaning where there is precedent matter expressed or necessarily understood or known, but never to establish a new charge."—*Krause* v. *Sentinel Company*, 19 N. W. 384; *Freeman* v. *Sanderson*, 24 N. E. 239; 13 Enc. Pl. & Pr. 102. Words imputing want of chastity to a woman are slanderous and actionable *per se*. *Romie* v. *Ryder*, 8 N. Y. Supp. 5; *Newman* v. *Stein*, 75 Mich. 402; *Prescott* v. *Tousey*, 50 N. Y. Sup. Ct. 12; 32 Cent. Dig. par. 71, col. 1933. It is also contended by defendant that the innuendoes do not give the natural meaning of the statements which they purport to explain. But where the article itself is libelous, the innuendo may be regarded as surplusage. 13 Enc. Pl. & Pr. 103: "If the words charged are not libelous *per se*, an innuendo is necessary. Of course, if the words complained of are unambiguous and obviously defamatory, no innuendo is necessary. If the indictment is good without an innuendo, the innuendo may be rejected as surplusage." Citing *Commonwealth* v. *Snelling*, 15 Pick. (Mass.) 321.

The second assignment of error relates to the refusal of the court to allow witness John C. Newman to be asked the following question: "Did you not tell of the said conversation at the investigation of the School Board about March 21, 1899?", as set out in Bill of Exception No. 1. The question was asked in an attempt to affect the credibility of the said Newman as a witness, who had testified that Baum's knowl-

edge of the scars on the person of Hattie Newman came from a conversation which he had had with said Baum in which he told Baum about the scars. Baum had testified that he knew of the scars on Hattie Newman by inspection. Baum and Hattie Newman were teachers in the colored school at Hagerstown and their conduct had been investigated by the Board of Education, and it appears in the record that she had been exonerated. There is nothing brought out in the evidence concerning the school investigation, which would have made it material for Newman to have said anything about the scars at that time, and whether he made any reference to it at that time is not material to the issue in this case, and whatever his answer might have been it would not be material.

The third assignment of error was the refusal of the court to permit Newman being asked the following question: "Are you the same John C. Newman who offered up prayers for J. R. Clifford at Harpers Ferry in 1899?", as set out in Bill of Exceptions No. 2. This question was also immaterial and could not affect the case at bar and it was not error to exclude it. McClaugherty v. Cooper, 39 W. Va. 313, (Syl. pt. 4), says: "Whether matter is material to the issue depends on the question whether its truth or falseness would affect the issue; and, if the truth or falseuess would not affect the issue, the matter is not material." What difference could it possibly make in this case whether the witness was the same man who had offered up prayers for defendant or not.

The fourth assignment of error, as in Bill of Exceptions No. 3, was that the court erred in not setting aside the verdict of the jury and granting the defendant a new trial because of the language used by the prosecuting attorney in his closing argument before the jury. The language referred to is as follows: "If he had been born a beast, would have have been a polecat; if he had been born a bird, would have been a buzzard; if he had been born a reptile, would have been a lizard; if he had been born a fish, would have been a mudcat; and if a man, a libeller." To the use of which language the defendant, by his attorney, objected and called the attention of the court to the same and the court very promptly instructed to the jury that the language was im-

proper and ought not to have been used and that it should not be considered by the jury in any way against the defendant. The fact that the court instructed the jury that this language was improper and should not be considered would counteract any affect the language may have had to prejudice the jury against the defendant, if it did not really prove a benefit to the defendant. In *State* v. *Allen*, 45 W. Va. (Syl. pt. 7), it is said: "Counsel necessarily have great latitude in the argument of a case, and it is, of course, within the discretion of the court to restrain them, but with this discretion, the appellate court will not interfere, unless it clearly appears from the record that the rights of the prisoner were prejudiced by such line of argument." And in *Landers* v. *Ry Co.*, 46 W. Va. Syl., it is held: "In order to authorize this Court to revise errors predicated upon the abuse of counsel of the privilege of argument, it should be made to appear that the party asked and was refused an instruction to the jury to disregard the unauthorized statements of the counsel." *State* v. *Shawn*, 48 W. Va. 1; *State* v. *Shores*, 31 W. Va. 491, (Syl. pt. 13).

The fifth assignment of error was that the court erred in not setting aside the verdict of the jury because the evidence was not sufficient to warrant the jury returning a verdict of guilty. The question of the weight of evidence is with the jury and a verdict should not be set aside unless it is clearly shown there is no substantial evidence at all to support their finding. In this case the defendant in his testimony states that he was the editor of the paper publishing the article set out in the indictment, and further says, "I am the author of that article." The defendant not only does not deny the writing and publishing of the article but seems to be proud of it, and attempts to justify its publication on high moral grounds; that he did it from pure motives; says he "wrote to arouse public sentiment." Such articles published habitually for a time in a decent community would evidently succeed in "arousing public sentiment," and if it failed to do so, the moral standard of the community permitting such obscene publications could not be considered very high. It was for the jury to say whether the publication was true and published "with good motives and for justifiable ends."

The sixth assignment of error was that the court erred

in not setting aside the verdict and granting a new trial because of the conversation had between the juror, J. Hanry Kastle, and W. L. Gaff after the case had been submitted to the jury and before rendering the verdict. According to the affidavits of Gaff, Kastle and A. S. Garrett who was also present, the conversation amounted to this: Kastle came into the store and Gaff asked him if he was still courting and Kastle replied that he was. Then Gaff said that from the evidence he had heard it would be hard for him to decide the case, as the woman swore one way and the man the other, Kastle making no reply to this statement. There was no expression of opinion on the part of Kastle or others which showed any prejudice on the part of Kastel against the defendant nor could the remark of Gaff have any influence on the juror tending to change his judgment in the case. When it clearly appears from the record that the defendant could not have been prejudiced by a remark made to a juror during the course of the trial the court would not set aside the verdict when the evidence is plainly sufficient to justify the verdict found. In *State* v. *Miller*, 24 W. Va. 802, the remark that "the defendant was in a tight place" was made in the presence of two of the jurors and was held not sufficient to set aside the verdict.

The seventh assignment of error was that the court erred in refusing to set aside the verdict and grant a new trial on the affidavit of defendant showing newly-discovered evidence. The affidavit of J. R. Clifford filed in support of his motion for a new trial gives the names of some three or four witnesses and shows by his affidavit what he expects to prove by them respectively, and that he discovered this since the trial. The affidavit seems to be sufficient in form but fails to produce the affidavit of any of said witnesses showing that they were ready to, and would testify to the facts set forth in case a new trial were granted. It is well settled that in order to entitle the mover to a new trial for newly-discovered evidence he must accompany his motion with the affidavit of the witnesses by whom he expects to prove the facts stated, showing that said witnesses are ready to so testify to such facts, or if the affidavit of the purported witnesses is not produced, the applicant must show satisfactory excuse for the absence of such affidavit. Defendant wholly

fails to show any excuse why the affidavits of the witnesses are not produced. As held in *State* v. *Williams* 14 W. Va. 851, (Syl. pt. 2): "Upon a motion for a new trial on the ground of newly-discovered testimony, the testimony of the newly discovered witness should be substantially set out in the affidavit of the witness as it can be testified to in the court before the jury, or a satisfactory excuse be shown for the absence of the affidavit." Citing in support of the decison *Armstrong* v. *Thompson*, 88 N. Y. Supp. 151. 4 Cur. Law, 861 refers to said *Armstrong* v. *Thompson* case in note 76.

For the reasons herein stated, the judgment of the circuit court is affirmed.

*Affirmed.*