445 S.E.2d 202

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Sharon JUSTICE, Defendant Below, Appellee.**

**No. 21859.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 12, 1994.

Decided May 24, 1994.

---

Stephen R. Van Camp, Asst. Atty. Gen., Charleston, for appellee.

Jane Moran, Williamson, for appellant.

PER CURIAM:

This is an appeal by Sharon Justice from an order of the Circuit Court of Mingo County sentencing her to life in the penitentiary with a recommendation of mercy for first degree murder. On appeal, the defendant claims that the jury's verdict was not supported by substantial evidence and that the prosecuting attorney abused his position during trial. She argues that she should have been granted a new trial on the basis of after-discovered evidence; that there was a material variance between the charges contained in the indictment against her and the proof presented by trial by the State; and that the court erred in failing to suppress certain items seized from her car. Lastly, the defendant claims that the State committed a number of acts of prosecutorial misconduct during her trial. After reviewing the questions presented, this Court can find no reversible error. Accordingly, the judgment of the Circuit Court of Mingo County is affirmed.

During the early evening hours of March 22, 1991, the defendant met Harold Cline, an individual who had the reputation of frequently carrying a large amount of money, at the Playpen, a small bar in Gilbert, West Virginia. She sat with him and conversed with him.

While the defendant was talking with Mr. Cline, Richard Collins and Randy Highlander entered the bar. Richard Collins knew the defendant's daughter, and he spoke to the defendant. Sometime later, according to Mr. Collins' testimony during the defendant's trial, the defendant took Mr. Collins aside and told him that Mr. Cline had a large amount of money. She suggested that she lure Mr. Cline to another club and that Mr. Collins follow them. She further suggested that Mr. Collins knock Mr. Cline over the head with a baseball bat, which she had in her car, at an appropriate time so that she could take his money.

After the defendant spoke with Mr. Collins, it was openly suggested that the party go to the next club up the road, where music was available for dancing. Mr. Cline learned of this suggestion and wanted to go along. A short time later, the defendant gave Mr. Collins and Mr. Highlander the keys to her car and asked them to take it up to the next club, and she proceeded to the club with Mr. Cline in his car.

When the defendant and Mr. Cline reached the next bar, which was called "Yesterdays," Mr. Cline parked and got out and started walking around to the passenger side door to let the defendant out. Before he got there, the defendant was already alighting from the car. A moment later, Richard Collins approached Mr. Cline with a baseball bat and struck him on the shoulder. He then proceeded to strike Mr. Cline on the head with sufficient force to fracture his skull. Mr. Cline later died of his injuries.

Shortly after the attack, the defendant, Mr. Collins, and Mr. Highlander left the scene in the defendant's car.

During her trial, the defendant denied that she had conspired with Mr. Collins and testified that she was horrified as she watched Mr. Collins attack Mr. Cline.

Two individuals who were at Yesterdays witnessed the attack on Mr. Cline from a distance. They were not able to identify the assailants, but one of the witnesses, Michael Burke, a security guard at Yesterdays, did manage to get the license plate number of the vehicle in which they left the scene. The license number was 1LF 998, a license plate number registered in the name of the defendant.

The State Police were notified of the attack and traced the license number taken by the witness to the defendant. They later found the defendant's car parked outside her trailer. When they arrived, Mr. Collins and Mr. Highlander were in the car, and the State Police placed them under arrest. One of the State troopers, Trooper Hedrick, observed an aluminum baseball bat lying on the passenger side floorboard. Another trooper, Trooper Schoolcraft, found a one-hundred-dollar bill and two one-dollar bills in Mr. Highlander's possession. A third trooper, Trooper Kuenzel, found two one-hundred-dollar bills and four fifty-dollar bills in the possession of Mr. Collins.

Inside the trailer, Trooper Hedrick advised the defendant of her *Miranda* rights and questioned her about the incident at Yesterdays. She stated that she knew Mr. Collins and Mr. Highlander and that she had let them use her vehicle. The defendant was not arrested. Her car, however, was impounded by the State Police.

On March 25, 1991, the defendant went to the State Police barracks and inquired about retrieving her car. Trooper Hedrick informed her that he was in the process of obtaining a search warrant for the car, and he indicated that he needed either a search warrant or a consent to search before he could search the vehicle. He also apparently informed her that she could not retrieve her car until it had been searched. The defendant indicated that she would give a consent to search, and she signed a form consent to search authorizing the State Police to search her car. According to Corporal Pope and Trooper Hedrick, who were present at the time the defendant signed the consent to search, the form was read to her, and she indicated that she understood it.

After the consent to search was executed, Trooper Hedrick took a photograph of the vehicle before actually conducting the search. The photograph showed the aluminum bat and a vodka bottle in plain view on the floor of the car. The actual search of the vehicle produced the bat, the vodka bottle, six one-dollar bills, a sock with a rock in it, and a receipt of Harold Cline dated March 9, 1990.

After further investigating the crime, the State Police concluded that the defendant was implicated in it, and she was indicted for murder. Mr. Collins and Mr. Highlander were also indicted. Mr. Collins subsequently plead guilty to first degree murder, and Mr. Highlander plead guilty to second degree murder.

The defendant was tried before a jury on January 6, 7, 8, and 9, 1992. At the conclusion of the trial, the jury found the defendant guilty of murder in the first degree and recommended mercy.

The Circuit Court of Mingo County subsequently sentenced the defendant to life in the penitentiary with a recommendation of mercy.

On appeal, the defendant claims that the evidence adduced during her trial did not support the jury's verdict.

In syllabus point 1 of *State v. Starkey*, 161 W.Va. 517, 244 S.E.2d 219 (1978), this Court summarized what should be considered in determining whether the evidence in a case supported the verdict. The Court stated:

In a criminal case, a verdict of guilt will not be set aside on the ground that it is contrary to the evidence, where the state's evidence is sufficient to convince impartial minds of the guilt of the defendant beyond a reasonable doubt. The evidence is to be viewed in the light most favorable to the prosecution. To warrant interference with a verdict of guilt on the ground of insufficiency of evidence, the court must be convinced that the evidence was manifestly inadequate and that consequent injustice has been done.

During the trial of the present case, Richard Collins, who had previously plead

guilty to first degree murder in conjunction with the killing of Mr. Cline, testified in behalf of the State. His testimony clearly implicated the defendant. Mr. Collins testified as follows:

A: She [the defendant] told me that the old man sitting at the bar [Mr. Cline] had $4,000.00 or $5,000.00 on him and that there was a ball bat in the car and she wanted me to knock him out so that she could take his money....

Q: And how was this to be accomplished?

A: I was to get the ball bat and knock him out and I was to follow her up to the club and when she had his back turned I was supposed to knock him out.

Q: Did you agree to do that?

A: Yes, sir, I did.

Q: Why?

A: Because she said her daughter needed some clothes.

Mr. Collins also testified that after he had knocked the victim to the ground, the defendant bent down and started going through Mr. Cline's pockets. He said that the defendant took Mr. Cline's billfold and urged him to follow. She started running toward her car, and he followed. He testified that after the two of them got to the car, the defendant was happy and gave him Mr. Cline's wallet and told him to take some of the money and give her the rest. Later, she took the wallet back, and when the car stopped in a small hollow, she burned the cards and papers in it.

The State adduced the testimony of Randy Lee Highlander, who had plead guilty to second degree murder in conjunction with the killing of Mr. Cline. Mr. Highlander's testimony indicated that Mr. Collins and the defendant planned the robbery of Mr. Cline. His testimony largely corroborated that of Mr. Collins. He further testified that at the time of the attack on Mr. Cline, the defendant did not attempt to help Mr. Cline in any way, that she did not scream, and that she did not run away. Instead, she bent over Mr. Cline's body. He further testified that, at that point, he ran from the scene of the immediate attack. He further testified that he left the general scene with Mr. Collins and the defendant in the defendant's car.

To develop its case further, the State called as a witness Michael Burke, the security guard at Yesterdays Club, who witnessed the assault on Mr. Cline and who managed to get the license number of the vehicle in which the perpetrators of the crime left the scene.

Further evidence adduced by the State showed that the license number obtained by Mr. Burke was registered in the defendant's name. The State also circumstantially connected the defendant's vehicle to the crime by offering evidence that a baseball bat, large amounts of money, and a receipt of Harold Cline's were found in the car.

In this Court's opinion, when the evidence adduced is viewed in the light most favorable to the prosecution, it is sufficient to convince impartial minds of the guilt of the defendant beyond a reasonable doubt, and it does not appear that the evidence was manifestly inadequate or that consequent injustice was done.

Under the circumstances, and in view of the rule set forth in syllabus point 1 of *State v. Starkey, Id.,* this Court believes that the defendant's contention that her conviction was contrary to the evidence is without merit.

■ The defendant also claims that there was a material variance between the defendant's indictment and the proof adduced by the State.

In conjunction with this, the defendant argues that the grand jury which indicted the defendant returned a two-count indictment against her. The first count was for murder in the first degree, and the second count was for aggravated robbery. As previously indicated, the defendant was convicted of first degree murder. In conjunction with the present assignment of error, the defendant argues that the evidence adduced fails to show any intent on the part of the defendant to kill. It also fails to show any evidence of premeditation.

It appears that the defendant was convicted under the felony murder theory.

The record indicates that Count 1 of the indictment against the defendant charged

that she "did feloniously, willfully, maliciously, deliberately, and unlawfully slay, kill and murder said Leonard Harold Cline."

The language in the indictment is in conformity with the provisions of W.Va.Code § 61–2–1, which provides:

> Murder by poison, lying in wait, imprisonment, starving, or by willful, deliberate and premeditated killing, or in the commission of, or attempt to commit, arson, kidnapping, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody, or a felony offense of manufacturing or delivering a controlled substance as defined in article four [§ 60A–4–401 et seq.], chapter sixty-a of this code, is murder in the first degree. All other murder is murder in the second degree. . . .

Under the terms of this statute, felony murder, or murder committed in the commission of a robbery, is a form of murder in the first degree.

■ Under the law of West Virginia, there is no such thing as an indictment for first degree murder or second degree murder. *State v. Schnelle,* 24 W.Va. 767 (1884). An indictment is for "murder," and the degree of murder depends upon the proof adduced at trial. *State v. Johnson,* 49 W.Va. 684, 39 S.E. 665 (1901). A general form of indictment for murder is good for conviction of murder in the first degree or the second degree or for any lower grade of homicide. *State v. Douglass,* 41 W.Va. 537, 23 S.E. 724 (1895). In view of the authorities, this Court believes that the indictment of the defendant for murder, in accordance with W.Va.Code § 61–2–1, was appropriate to support a conviction for first degree murder.

The Court further notes that the statutory form of indictment for murder is sufficient in a case for first degree murder by felony murder. *State v. Young,* 173 W.Va. 1, 311 S.E.2d 118 (1983); *State v. Bragg,* 160 W.Va. 455, 235 S.E.2d 466 (1977); *Ford v. Coiner,* 156 W.Va. 362, 196 S.E.2d 91 (1972). It is not necessary under the law that the indictment set forth the means of the death of the deceased. *State v. Bragg, supra.*

■ In syllabus point 5 of *State v. Bragg, supra,* the Court summarized these principles in the following manner:

> An indictment which charges that the defendant feloniously, wilfully, maliciously, deliberately, premeditatedly and unlawfully did slay, kill and murder is sufficient to support a conviction for murder committed in the commission of, or attempt to commit arson, rape, robbery or burglary, it not being necessary, under *W.Va.Code,* 61–2–1, to set forth the manner or means by which the death of the deceased was caused.

In the present case, the evidence does support the conclusion that the defendant was implicated in the robbery of Harold Cline and that that robbery resulted in his death. The Court believes that there was adequate proof to support a felony murder verdict and that, under the authorities cited, the indictment adequately charged the crime of which the defendant was convicted.

■ The defendant next claims that the trial court erred in failing to suppress the items seized from her car pursuant to the consent to search.

Prior to trial, the defendant moved to suppress the items which were seized pursuant to the consent to search which she signed.

Before ruling on the suppression motion, the trial court conducted an appropriate suppression hearing. At the conclusion of that hearing, the court ruled that the consent to search was a valid consent to search and that the items seized were properly admissible into evidence.

The record relating to the events surrounding the defendant's giving a consent to search shows that on March 25, 1991, the defendant voluntarily went to the State Police Barracks to inquire about the return of her automobile, which had been impounded. At the State Police Barracks, the defendant was informed that the State Police were in the process of obtaining a search warrant for the vehicle and that they could not release it before the search. According to evidence which was adduced, the defendant, of her own free will, decided to sign a consent to search to speed the return of her vehicle. The consent-to-search form was read to the

defendant, and she indicated her understanding by signing the form.

As previously indicated, the trial court found that the consent to search was valid and that the subsequent search conducted pursuant to it was legal and the items found were admissible into evidence.

■ In syllabus point 1 of *State v. Angel,* 154 W.Va. 615, 177 S.E.2d 562 (1970), this Court recognized that:

> The State and Federal Constitutions prohibit any unreasonable searches and seizures and there are numerous situations in which a search and seizure warrant is not needed, such as an automobile in motion, searches made in hot pursuit, searches around the area where an arrest is made, things that are obvious to the senses, and property that has been abandoned, as well as searches and seizures made that have been consented to.

The Court has also recognized that:

> The general rule is that the voluntary consent of a person who owns or controls premises to a search of such premises is sufficient to authorize such search without a search warrant, and that a search of such premises, without a warrant, when consented to, does not violate the constitutional prohibition against unreasonable searches and seizures.

Syllabus point 8, *State v. Plantz,* 155 W.Va. 24, 180 S.E.2d 614 (1971). *See also State v. Smith,* 186 W.Va. 33, 410 S.E.2d 269 (1991); and *State v. Worley,* 179 W.Va. 403, 369 S.E.2d 706 (1988), *cert. denied,* 488 U.S. 895, 109 S.Ct. 236, 102 L.Ed.2d 226 (1988).

Further, the Court has repeatedly indicated that whether a consent to search is voluntary is a question of fact to be determined from the totality of the circumstances. *State v. Worley, Id.; State v. Farmer,* 173 W.Va. 285, 315 S.E.2d 392 (1983); and *State v. Craft,* 165 W.Va. 741, 272 S.E.2d 46 (1980).

In the present case, there was evidence that the defendant indicated that she would consent to a search of her car. There was evidence that the police already had the vehicle impounded and that they were in the process of obtaining a warrant to search it. The facts suggest that the defendant had a motivation to consent to a search in that she wanted possession of her vehicle. There was also evidence that the consent to search form was read to her, that she indicated that she understood it, and that she signed it. Rather clearly the State had already impounded the defendant's car, and there was no need for the State to fabricate a consent to search or to compel the defendant to consent to the search.

In this Court's view, the totality of the circumstances suggest that the consent to search was voluntary, and this Court believes that the defendant's assignment of error on this point is without merit.

■ Lastly, the defendant claims that the prosecution was guilty of a number of acts of prosecutorial misconduct and that she was denied a fair trial.

In conjunction with her charge that the prosecution was guilty of prosecutorial misconduct, the defendant argues that the prosecutor abused her and her counsel during trial. She also claims that the prosecutor, during closing argument, made improper statements and misled the jury on the elements of felony murder.

In arguing that the prosecutor abused her during trial, the defendant claims that the prosecutor improperly questioned her about giving up a child for adoption and improperly inquired into the question of whether she had ever used drugs.

During direct examination, the defendant was asked by her own attorney whether she had any children. She indicated that she did. She was then asked by her own attorney:

Q: There has been testimony that you have adopted one of your children to your mother. Is that correct?

A: Yes.

Q: Why did you do that?

A: My mother could take care of her better financially.

During cross-examination, the State pursued this subject by asking:

Q: And you indicated that you adopted Erica to your mother.

A: Yes.

On appeal, the defendant claims that this cross-examination constituted prosecutorial misconduct.

In a number of cases, this Court has recognized that the scope of cross-examination is coextensive with the evidence given on direct examination; that is, a witness may be cross-examined on matters which are raised on direct examination. *See, e.g., State v. Asbury,* 187 W.Va. 87, 415 S.E.2d 891 (1992); *State v. Green,* 187 W.Va. 43, 415 S.E.2d 449 (1992); and *State v. Richey,* 171 W.Va. 342, 298 S.E.2d 879 (1982).

The defendant also argues that the State improperly cross-examined her about drug use. There was evidence in the case that Randy Highlander and Richard Collins, the co-conspirators in this case, had used cocaine on the night of the trial. On cross-examination, the prosecutor asked the defendant: "Had you ever done cocaine with Randy?" The defendant responded: "I don't do cocaine. I do not do drugs." The prosecution pursued the question no further.

■ In syllabus point 7 of *State v. Cirullo,* 142 W.Va. 56, 93 S.E.2d 526 (1956), this Court, citing syllabus point 6 of *Yuncke v. Welker,* 128 W.Va. 299, 36 S.E.2d 410 (1945), stated:

> Failure to make timely and proper objection to remarks of counsel made in the presence of the jury, during the trial of a case, constitutes a waiver of the right to raise the question thereafter either in the trial court or in the appellate court.

*See State v. Trogdon,* 168 W.Va. 204, 283 S.E.2d 849 (1981); *State v. Lewis,* 133 W.Va. 584, 57 S.E.2d 513 (1949); *State v. Fisher,* 123 W.Va. 745, 18 S.E.2d 649 (1941); and *State v. Clifford,* 58 W.Va. 681, 52 S.E. 864 (1906).

Under this, this Court believes that the defendant waived her right to challenge on appeal the remarks of which she complains. The Court further notes that the remarks did not establish that the defendant used cocaine, a fact which would have obviously been prejudicial to her case. Instead, they constituted a denial that she used cocaine, a point that the State did not challenge.

■ In addition to claiming that the State improperly examined her during trial, the defendant claims that the prosecution abused her attorney, Jane Moran. This claim grows out of a remark made by the prosecutor during closing argument. The prosecutor argued that the defendant had "used Richard Collins, Randy Highland, and she has used Jane Morgan." The defendant's attorney immediately objected to this remark, and the court instructed the jury:

> Ladies and Gentlemen of the jury, the remark that Mrs. Justice has used her lawyer will not be considered by the jury. There is no evidence of that, and you aren't to consider matters that are not in evidence.

■ This Court has recognized that some latitude should be allowed on closing argument and that improper remarks will not be considered reversible error unless they work a "manifest injustice" or clearly prejudiced the accused. As stated in syllabus point 5 of *State v. Ocheltree,* 170 W.Va. 68, 289 S.E.2d 742 (1982):

> A judgment of conviction will not be reversed because of improper remarks made by a prosecuting attorney to a jury which do not clearly prejudice the accused or result in manifest injustice.

Given the admonitory instruction given by the Court, as well as the nature of the challenged remark, this Court does not believe that the defendant has demonstrated that the prosecutor's remark worked a "manifest injustice" or that it clearly prejudiced the defendant.

■ In addition to arguing that there was prosecutorial misconduct, the defendant claims that the prosecutor made additional remarks on closing argument that misled the jury. One sequence about which the defendant complains proceeded as follows:

> Sharon Justice would have you believe from that witness stand that she left because she was scared of Richard—he had gone hog wild. Yet, she gave Richard her car when they leave Gilbert at the Gilbert Creek Bridge. She would have you believe she was scared of him then, but she takes her elderly mother out later that

night to seek this man she's been running from, trying to get away from all night. That's ridiculous, totally ridiculous! All you have to do to gauge her credibility is to look at that, to look at the events. . . .

Another proceeded as follows:

She did not tell the police the truth which was that Dallas Hatfield took her back up to the Playpen . . . It wasn't the Cline man . . . She said she didn't want to tell the police about Dallas Hatfield because 'I didn't want to get him involved,' but she wants to get someone who wasn't involved at all—Mr. Cline. This makes no sense. It shows that continual—the continual lying of this defendant to the police and on the stand.

The defendant made no objection to these statements.

It appears to this Court that, to a large extent, the prosecutor went through the story told by the defendant and examined the inconsistencies and improbabilities in it.

As indicated in *State v. Ocheltree, Id.,* the question of whether prosecutorial remarks during closing argument constitute reversible error depends on whether they work a "manifest injustice" and whether they clearly prejudice the defendant. Wholly apart from the closing remarks, there was direct evidence that the defendant was involved in the crime charged and circumstantial evidence connecting her vehicle with the crime. The remarks, since they, to a large degree, track the inconsistencies in the defendant's testimony, cannot, in this Court's opinion, be viewed as clearly prejudicing the defendant.

The Court notes that the prosecutor's remark about the defendant lying on the stand was improper, but that in a number of cases more offensive statements have been held to be insufficient to warrant a reversal of a conviction. *State v. Dietz,* 182 W.Va. 544, 390 S.E.2d 15 (1990) (No manifest injustice where the prosecutor remarked that the de-

fendant was a "liar."); *State v. Barker,* 168 W.Va. 1, 281 S.E.2d 142 (1981) (Defendant was lying to save his own neck.); *State v. Buck,* 170 W.Va. 428, 294 S.E.2d 281 (1982) (Buck was in there to kill him.); *State v. Lewis,* 133 W.Va. 584, 57 S.E.2d 513 (1949) (Prosecutor characterized defendant as an "abortionist, seducer, debaucher, and a butcher." "That is what he is, a butcher.").

■ The defendant additionally claims that the prosecuting attorney, during his closing argument, improperly misled the jury on the elements of felony murder.

In considering this, the Court notes that the court properly instructed the jury on the elements of felony murder.[1] During closing argument, the prosecutor stated:

I want you to realize now that it's not the State's opinion that murder was committed here premeditatedly and deliberately. That doesn't mean this defendant is not guilty of murder, because the Court has told you there's another first degree murder in this State and it's called felony murder and that's when a person dies at the hands of criminal action though it may be accidental and the reason for that is that people should not escape the death of one in a criminal act. If you return a first degree murder verdict in this case, it is a felony murder case.

To counter this, the defense argued:

[I]f someone is to be found guilty under felony murder theory they must have an intent to commit some crime or some unlawful act. By simply being present at the time this takes place, at the time either the criminal act or the murder takes place that's not enough. The Judge has told you in his instructions there must be a specific intent on the part of that person to commit a crime or an unlawful act.

On rebuttal, the State argued:

[I]f you've involved by yourself or with someone in the commission of a crime such

---

1. The court told the jury:

1. Murder of the first degree is when one person, with intent to kill, kills another person feloniously, unlawfully, willfully, maliciously, deliberately and premeditatedly.

The Court instructs the jury that murder in the first degree is also committed if the homi-

cide occurs accidentally or otherwise during the commission or the attempt to commit arson, sexual assault, robbery or burglary. In such cases, the State is not required to prove malice or premeditation or that the defendant had any specific intent to kill the victim. This crime is called felony murder.

as robbery, an individual dies from that, then you're guilty of felony murder—it's first degree murder, and then you decide whether there's mercy or not.

Given the context of the whole trial, and given the fact that the jury was properly instructed by the trial court on the factors to be considered in weighing a felony-murder conviction, this Court cannot conclude that the prosecutor's argument was prejudicial.

■ Lastly, the defendant claims that there were additional circumstances in her case which conspired to deny her a fair trial and which render her conviction tainted.

Randy Highlander, one of the individuals implicated in the murder giving rise to this case, was represented by Charles West. In preparing Mr. Highlander's case, Mr. West, on at least three occasions, met with the defendant and interviewed her. The defendant claims that as a result of these meetings, she believed that Mr. West was representing her. She further claims that Mr. West sent her to the State Police to retrieve her car without counsel to advise her. She claims that when she went to the police, she signed the consent which led to the search of her vehicle. She claims that she did not understand the significance of her action.

The defendant also argues that Mr. West used information gleaned while she believed that he was acting as her attorney to get a better bargain for his client, Randy Highlander.

In essence, the defendant argues that the legal system, acting through Mr. West, misled her as to her legal posture and acted to deprive her of a fair trial.

During the development of this case, Mr. West testified that he told the defendant on numerous occasions that he would not represent her. He further stated that he interviewed her as a witness and not as a client.

Essentially, the Court believes that the evidence on what occurred during Mr. West's contacts with the defendant is entirely contradictory, and the trial court resolved the contradictions in favor of the State. There is testimony to support the trial court's decision, and although the defendant continues to

adhere to her claims, there is nothing in the record other than her testimony which establishes that the legal system misled her or that her contacts with Mr. West resulted in a denial of a fair trial.

■ A final argument made by the defendant is that the State failed to disclose adverse information about Trooper Donald Hedrick, one of the two troopers who interviewed the defendant and obtained the consent to search her vehicle.

It appears that Trooper Hedrick became the object of an internal State Police investigation while the defendant's trial was pending and that, at the time of trial, Trooper Hedrick was on paid administrative leave from the State Police. Some three to four weeks after the defendant's trial, Trooper Hedrick was discharged from the State Police. He subsequently appealed his dismissal. The charges against Trooper Hedrick arose from a set of facts totally unrelated to those in the present case.

The defendant essentially claims that the investigation of Trooper Hedrick and the fact that he had been suspended from the State Police were factors which potentially would have affected his credibility during trial. She argues that the State should have revealed the investigation and suspension to her prior to trial so that the information could have been available to her attorney during trial.

It appears that at the time Trooper Hedrick became involved in the defendant's case, Corporal Roby Pope was present with him and the defendant at the State Police barracks. Trooper Hedrick's testimony during the defendant's trial involved the obtaining of the consent to search from the defendant, the search, and the defendant's statements. The testimony of Trooper Hedrick was wholly corroborated at trial by the testimony of Corporal Roby Pope.

In this Court's view, even if Trooper Hedrick's credibility had been effectively impeached at trial because of the investigation concerning him and his suspension, the testimony of Corporal Pope would have stood. Additionally, the testimony of neither trooper was wholly necessary to convict the defen-

dant. The defendant's guilt was established by the testimony of co-conspirators, Richard Collins and Randy Highlander, and by other witnesses.

While the Court believes that the State should have revealed the investigation of Trooper Hedrick, the impeachment of Trooper Hedrick could not have affected the outcome of the trial beyond a reasonable doubt.

After reviewing the record and the questions raised in this case, the Court can find no reversible error. Accordingly, the judgment of the Circuit Court of Mingo County is affirmed.

Affirmed.