**People of the State of Illinois, Plaintiff-Appellee, v. C. B. Caldwell, Defendant-Appellant.**

**Gen. No. 50,420.**

First District, Third Division.

January 12, 1967.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Marshall A. Patner, Frederick F. Cohn and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Albert J. Armonda, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE DEMPSEY delivered the opinion of the court.

A jury found the defendant, C. B. Caldwell, guilty of murder and the trial judge sentenced him to the penitentiary for a term of fifty to one hundred years.

He was indicted for the murder of Bessie Mae Woods in Cook County, Illinois, and he contends that either his conviction should be reversed because the indictment was defective in not specifying the place of the offense, or that he should be given a new trial because (1) the court failed to give a manslaughter instruction; (2) the prosecutor's closing argument was prejudicial; (3) his confession was obtained under circumstances which violated his constitutional rights, and (4) his confession was allowed to be

taken into the jury room. In the alternative he requests this court to reduce his sentence.

Mrs. Woods lived with her husband in an apartment in Chicago. Caldwell, who had known Mrs. Woods all his life, lived in a room adjoining the Woods' apartment. His room was separated from their apartment by a connecting bathroom. In the middle of the afternoon of April 24, 1964, he was talking to Mrs. Woods in her kitchen. Her uncle, William O'Neil, an elderly man who walked with a cane, was visiting her and was sitting in the living room. O'Neil heard his niece and Caldwell arguing about two dollars. Mrs. Woods said she "didn't have no two dollars." She kept repeating this and, upon hearing a scuffle, O'Neil went to the kitchen door. Caldwell was holding his niece by the collar and O'Neil told him to stop what he was doing and to get out.

Caldwell went to his own room but came back in a minute or two with a gun in his hand and headed for the kitchen. O'Neil tried to stop him but he shoved O'Neil aside. O'Neil fell over a chair; before he could get up he heard Caldwell follow his niece out the back door. A moment later he heard a shot. He found his niece lying in the back areaway. Caldwell had disappeared.

About 5:00 p. m. on the same afternoon a Chicago policeman, dressed in plain clothes, was sitting in his auto in front of the Woods' apartment. He observed a man walking on the opposite side of the street. The man stopped and then walked on. A boy called out, "Hey, Sonny Boy." The officer, knowing that this was Caldwell's nickname, got out of his car, identified himself as a police officer and, with his gun pointed at the man, started across the street. The man, Caldwell, put his hands in the air. He was searched and a .22 caliber revolver with two expelled bullet casings and five unexpended cartridges was found in his pocket. He was disarmed, handcuffed and placed in the automobile.

Before taking Caldwell to the police station the officer asked him for his side of the story. Caldwell told him that the argument with Mrs. Woods was carried over from the night before and was about another boy friend; that he and "Uncle Neal" [William O'Neil] also argued and the uncle hit him with a stick. He walked to his room, got his gun and returned. He pushed O'Neil aside and shouted into the kitchen, "You started this whole thing." At this Mrs. Woods ran out of the back door and he chased her. He caught up to her at the bottom of the steps, "grabbed her collar and she started to struggle and that's when I let her have it."

Caldwell said that he told some boys who were in front of the building that he had shot "Bessie" and for them to call the police. He explained that he was returning to give himself up when the officer arrested him.

At the station Caldwell was not placed behind bars but his handcuffs were attached to a radiator while the officer went to the hospital to speak to Mrs. Woods. He was unable to talk to her. She had been shot in the left temple and was unconscious. She died three weeks later. About an hour and a half had elapsed from the time the officer left the station until he returned. A typed statement was then taken from Caldwell which he signed. This statement was substantially the same as the oral one.

At the trial Caldwell testified that he and Mrs. Woods did not argue or scuffle; that O'Neil came into the kitchen with a cane in his right hand and a knife in his left and, without saying a word, hit Caldwell with the cane and put the knife to his neck. Mrs. Woods exclaimed, "No, Uncle William! Don't cut him." O'Neil replied, "He ain't got no business in here" and told him to get out. Caldwell left and when he came back O'Neil stepped toward him. They had a few words and Mrs. Woods screamed and ran out of the back door. He followed her into the yard and asked why she was running. She replied she was afraid of guns. As they were walking

back to the house she grabbed his hands, the gun fired and she fell. He said he did not fire the gun, that it went off when she snatched it and that he did not aim it at her or intend to shoot her. When he saw that she was bleeding he became frightened and ran away through an alley.

■ There is no merit to the defendant's contention that the indictment was defective. A long line of cases, starting with People v. Petropoulos, 59 Ill App2d 298, 208 NE2d 325 (1965), has held that an indictment which alleges that an offense occurred in a certain county complies with the statutory requirements (Ill Rev Stats, 1963, c 38, § 111–4(a)(4)); People v. Zeravich, 64 Ill App2d 150, 212 NE2d 282 (1965); People v. Blanchette, 33 Ill2d 527, 212 NE2d 97 (1965); People v. Petropoulos, 34 Ill2d 179, 214 NE2d 765 (1966).

The jury was not given a manslaughter instruction and the defendant protests that this was error. On the first day of the trial, during a recess at the close of the State's case, the defendant's counsel inquired about the propriety of such an instruction and the trial judge replied that, as of that time, he would refuse to give an instruction on manslaughter. At the termination of all the testimony, while going over the instructions, the defense counsel asked that the record show that he proposed to offer a manslaughter instruction but that it would be useless. The judge recalled the discussion of the previous day and observed that an instruction had not been tendered. The defendant's counsel said that he would prepare an instruction for the record, but none was ever offered.

■ A trial judge has no duty to give instructions where a defendant does not tender them and the defendant cannot now fairly object that none was given. People v. Carvin, 20 Ill2d 32, 169 NE2d 260 (1960); People v. Baker, 8 Ill2d 522, 134 NE2d 786 (1956); People v. Weisberg, 396 Ill 412, 71 NE2d 671 (1947). Moreover, if a manslaughter instruction had been refused it would not

have been error. The theory of the defense was that Mrs. Woods came to her death as a result of an accident. In his opening statement the defendant's attorney said that the evidence would disclose that the shooting "was an accidental act." The defendant testified that the shooting was accidental; his attorney argued to the jury that it was accidental and at the defendant's request the court instructed the jury on the theory of accident. If the State's evidence was believed, the defendant was guilty of murder; if the defendant's testimony was believed, Mr. Woods' death was accidental. There was no evidence that the killing was manslaughter—either voluntary or involuntary—and it would have been error to have given instructions on that subject. People v. Burnett, 27 Ill2d 510, 190 NE2d 338 (1963); People v. Wheeler, 57 Ill App2d 452, 206 NE2d 727 (1965).

■■ One of the two remarks of the prosecutor which the defendant protests as being inflammatory occurred in the opening argument when the prosecutor said that Caldwell's initials "C. B." meant "cold blooded." The prosecutor stated that Caldwell did not go after O'Neil with whom he testified he had quarreled, but that he pursued Mrs. Woods, grabbed her by the collar and raised his gun to fire. He then added: "Well, that does one thing for us. It tells us what 'C. B.' means in front of Caldwell —'cold blooded.'" We see nothing wrong in this characterization. The purport of this argument was that Caldwell was not provoked with O'Neil; that Mrs. Woods was his target; that she knew it and fled, and that the killing was deliberate. The argument was supported by evidence and the characterization was a fair comment on the evidence. It is not improper for a prosecuting attorney to reflect unfavorably on a defendant or to comment on his actions if based on pertinent evidence. People v. Miller, 13 Ill2d 84, 148 NE2d 455 (1958).

■ The second remark occurred in the final argument of the prosecutor. He said that according to Cald-

well's statement Caldwell was choking Mrs. Woods while he pointed the gun at her. The defendant objected. The court overruled the objection saying, "There is evidence in the statement that he said, 'I grabbed her by the collar.'" The prosecutor was in error when he said Caldwell admitted choking Mrs. Woods, but the error was not a grievous one and the trial judge, although he did not sustain the objection, immediately corrected the prosecutor's error by quoting the exact language used by Caldwell.

It is contended that the defendant's confession was taken under circumstances which violated his constitutional rights and that its admission into evidence over objection constituted reversible error. The circumstances enumerated are: (a) the defendant was handcuffed to a radiator prior to the confession; (b) the provisions of the "Rights of Accused" (Ill Rev Stats, 1963, c 38, article 103, as set out in section 103-7) were not read to the defendant and they should have been because he could not read the printed, posted notice of these rights; (c) the statement was taken by the arresting officer only and this amounted to a secret inquisition because no third person was present; (d) the defendant was not told of his right to remain silent; (e) he was not told of his right to counsel; (f) the typed statement was not read to him and, (g) he did not sign the statement.

██ The oral statement of guilt made by the defendant upon his arrest was not objected to in the trial court and is not challenged in this court. When the written statement was offered in evidence the defendant's attorney objected on the ground that there was no proper foundation, but at no time, either before trial or during the trial, did he object that it was involuntary, and no motion to suppress was ever made. The written statement was taken within three hours of the defendant's arrest. He was not subjected to repeated questioning. He does not claim that he was harassed or badgered into confessing;

he does not claim that he was beaten or that physical force was used upon him. His only complaint in this respect is that before his statement was taken he was handcuffed to a radiator. This could be an important factor in considering the voluntariness of the statement. However, there is no evidence that he was not seated or was otherwise uncomfortable during the time the arresting officer was away. Instead of being confined in a cell he was held in custody in another room while the officer attempted to check his version of the shooting with his victim. What was done was reasonably necessary to prevent his escape, and what was done did not influence his written statement—his written and oral statements were substantially identical.

■ At his trial the defendant testified that he did not read the statement because the room was too dark. In rebuttal the officer who took the statement said the defendant did read it and that the room was brightly lighted with fluorescent lights. In surrebuttal the defendant, for the first time, said he could not read. In the statement itself the defendant, who was 34 years old and had gone through the fifth grade, said he could both read and write. Whether he could read or not was for the jury to determine. After a confession has been received in evidence the weight to be given the confession is entirely for the jury. People v. Hurry, 385 Ill 486, 52 NE2d 173 (1944).

The defendant's assertion that he could not read would have to be accepted as true before weight could be lent to his further contentions that the statement was not read to him and that the posted "Rights of Accused" should have been read to him. At best his ability to read was a question of fact which the jury resolved against him.

■ Nor can we accept his assertion, made for the first time in this court, that he did not sign the statement. He did not dispute his signature at the trial and

we do not think he can truthfully dispute it now. We note that the same signature appears elsewhere in the record, e. g.: on his Notice of Appeal and on his petition for a Stenographic Transcript of Proceedings.

█ The defendant did not request counsel and none was prevented from seeing him. However, he was not told before he made either his oral or written statement that he could remain silent and that he had the right to the assistance of counsel. But it has been held that the failure to warn an accused of his right to remain silent and (in the absence of a request for counsel) a failure to inform him of his right to counsel, do not make statements involuntary but are circumstances to be weighed in considering their voluntariness. People v. Jackson, 35 Ill2d 162, 220 NE2d 229 (1966); People v. Kees, 32 Ill2d 299, 205 NE2d 729 (1965); People v. Hartgraves, 31 Ill2d 375, 202 NE2d 33 (1964). Since the defendant did not request counsel, Escobedo v. Illinois, 378 US 478, 84 S Ct 1758, 12 L Ed2d 977, upon which he relies is not applicable. Nor is the decision in Miranda v. State of Arizona, 384 US 436, 86 S Ct 1602, 16 L Ed2d 694, of benefit to the defendant. The trial in the present case started on February 8, 1965, and the standards established in the Miranda decision apply only to those defendants whose trials began after June 13, 1966, the date of that decision. Johnson v. New Jersey, 384 US 719, 86 S Ct 1772, 16 L Ed2d 882; People v. Heise, 35 Ill2d 214, 220 NE2d 438 (1966); People v. McGuire, 35 Ill2d 219, 220 NE2d 447 (1966).

█ The remaining contention in reference to the voluntariness of the confession, that a third person was not present when it was taken, is without merit.

█ █ A more meritorious contention is that the court improperly permitted the written confession to be taken into the jury room. This was done over the objection of the defendant. In People v. Spranger, 314 Ill 602,

145 NE 706 (1924) two brothers appealed a murder conviction in which the trial court, over objection, permitted the confession of one of the defendants to be taken to the jury room. The Supreme Court stated: "It is error to permit the jury to take with them for consideration in the jury room depositions and dying declarations. . . . The same rule applies to confessions or other instruments of evidence depending for their value on the credibility of the maker." In the case of People v. Allen, 17 Ill2d 55, 160 NE2d 818 (1959) it was held that whether exhibits may be taken to the jury room is a matter resting largely in the sound discretion of the trial judge. In Allen, however, and in People v. Ciucci, 8 Ill2d 619, 137 NE2d 40 (1956) cited in the Allen case, the exhibits which went to the jury room were physical objects, not a confession. Although Allen seems to have been interpreted in recent cases (People v. Somerville, 71 Ill App2d 381, 219 NE2d 116 (1966), leave to appeal denied September 28, 1966; People v. Dixon, 75 Ill App2d 77, 221 NE2d 35), as impliedly overruling Spranger, we are of the opinion that Spranger, and its underlying rationale, is still the controlling law.

In People v. Somerville and People v. Dixon, supra, convictions were affirmed although written statements had been permitted in the jury room. Both cases distinguished the Spranger decision. In People v. Somerville, an armed robbery case, an incriminating statement of an accomplice, who was indicted but not tried with the three defendants, was given to the jury when it retired. The accomplice had testified to the substance of the statement and its contents had been read to the jury. The opinion stated that while it was not necessary to have the statement read to the jury or sent to the jury room after the accomplice had testified to its contents "we hold that it was not an abuse of discretion to do so, and the defendants were not prejudiced thereby." In Dixon, also an armed robbery case, the defendant's confession went

284

to the jury room without objection but the point on appeal was raised under the "plain errors" statute. (Ill Rev Stats 1963, c 38, § 121–9). The court said:

"While we feel that a trial judge should exercise great caution and consider the problem very carefully before permitting the jury to take a confession with them to the jury room, we hold that under the circumstances of this case the defendant could not have been prejudiced thereby."

In a third case, People v. Bailey, 76 Ill App2d 310, 222 NE2d 268, a murder case, the same court affirmed a conviction where the defendant's statement had been taken to the jury room, and People v. Spranger was again distinguished. In Bailey, as in the case at bar, only the defendant and the deceased were present when the latter was shot and the defendant claimed that the killing was accidental. The court said: "As to allowing the defendant's statement to go to the jury room we do not find any abuse of discretion to the prejudice of the defendant."

■■■ Unlike the Somerville, Dixon and Bailey cases we find no meaningful distinction between People v. Spranger and the present case. We do have, however, a reason in common with those cases for holding in the present case that no prejudicial error resulted from permitting the jury to have the confession. In those cases, as in this, the evidence of the defendants' guilt was conclusive apart from the written statements. In Somerville the court stated: "We have carefully reviewed the entire record and find the evidence of the guilt of the defendants to be overwhelming." In Dixon the court found that "there was persuasive independent evidence of the defendant's guilt." In Bailey the court was of the opinion that "the jury could not have reached any other conclusion than they did. . . ."

In the case at bar the proof of the defendant's guilt did not depend on his written confession and furthermore

it did not depend on his oral confession. Independent of either or both statements, the evidence established his guilt beyond a reasonable doubt—and if the oral statement is added to the evidence the proof of guilt is beyond question.

■ Another phase of the confession going to the jury room is also advanced as error. The written confession was marked Exhibit 2 and was introduced into evidence. A copy of the confession, which had been given to the defendant's attorney and used by him in the trial, was marked Exhibit 2A and was not introduced into evidence. By inadvertence Exhibit 2A was sent to the jury room instead of Exhibit 2. This was error but no prejudice to the defendant resulted from it.

■ ■ The purpose of a review in a criminal case is not to decide whether the record is perfect, but to determine whether the defendant had a fair trial free from substantial and prejudicial errors, and whether his conviction is based upon evidence establishing his guilt beyond a reasonable doubt. People v. Naujokas, 25 Ill2d 32, 182 NE2d 700 (1962). If the errors complained of could not reasonably have affected the result of the trial the judgment should be affirmed. People v. Cardinelli, 297 Ill 116, 130 NE 355 (1921). The evidence of the offense of murder and of the defendant's guilt is of the convincing character required to justify an affirmance of the judgment despite the two errors which occurred during the trial.

■ Before imposing the sentence of fifty to one hundred years the trial judge analyzed the evidence. Among other things, the court said that Caldwell did not quarrel with O'Neil: "The story about the old man was utter nonsense. That old man could barely stand to get on the witness stand." The Judge said that Caldwell got his gun and went for Mrs. Woods; that "he killed her in cold blood for no reason whatsoever"; that he was

satisfied that he killed her, let her lie where he had shot her and walked away. The State had recommended the sentence and the court accepted it, observing that it was a reasonable and appropriate one in this case.

A reviewing court in Illinois has the power to reduce the punishment imposed by the trial court (Ill Rev Stats, 1963, c 38, § 121-9(b)(4)) but in this case, in view of the nature of the crime and the record before us, we cannot say that the sentence imposed was improper. Although the sentence may, at first blush, seem severe, the minimum term of fifty years is not as rigid as it appears. Any minimum term in excess of twenty years is treated as one of twenty years for the purpose of parole eligibility. (Ill Rev Stats, 1965, c 38, § 123-2(3).) With the time credit which may be received for good behavior, a prisoner serving a minimum sentence of twenty or more years becomes eligible for parole at the expiration of eleven years and three months. In the present case there is, therefore, a wide spread between the minimum and maximum terms which the defendant may serve. This flexibility of incarceration will permit the parole board to exercise the judgment contemplated by the sentencing and parole laws of our State.

The judgment and sentence are affirmed.

Affirmed.

SULLIVAN, P. J. and SCHWARTZ, J., concur.