390 S.E.2d 15

**STATE of West Virginia**

v.

**Karl DIETZ.**

**No. 18909.**

Supreme Court of Appeals of West Virginia.

March 8, 1990.

Victor A. Barone, Charleston, for Karl Dietz.

Roger W. Thompkins, Atty. Gen., C. Terry Owens, Sr. Asst. Atty. Gen., Charleston, for the State.

McHUGH, Justice:

This case is before the Court upon the appeal of Karl Dietz. The appellant was convicted of first degree murder by a jury in the Circuit Court of Cabell County and was sentenced to life imprisonment, with a recommendation of mercy. This Court has reviewed the petition for appeal, all matters of record, and briefs of the parties.

We are of the opinion that the appellant's conviction should be affirmed.

## I. FACTS

The victim in this case was Sandra J. Chapman. On March 31, 1987, the appellant met the victim at a tavern in Huntington, at approximately 1:00 a.m. After engaging in a conversation at the tavern, the appellant and the victim went to the appellant's apartment.

There were no witnesses to the homicide. The appellant contends that the following transpired at his apartment: The victim wanted to engage in sexual intercourse, but the appellant declined. Both the victim and the appellant were intoxicated at the time. The victim then went to use the appellant's bathroom. The appellant was sitting on his bed. The victim then went into the appellant's kitchen, and the appellant "heard something clank around." The victim then returned to the appellant's bedroom, naked, except for her stockings, and holding a knife behind her back. The victim pulled the knife from around her back and advanced toward the appellant, pressing him against the bed, and saying "I could kill you right here if I wanted to." The appellant managed to reach for and grab the cord from his bathrobe, which was near the victim and appellant. The appellant wrapped it around the victim's neck and pulled on it tightly. The victim fell back and struck the floor. The appellant realized that the victim was dead, and became fearful and panic-stricken. The appellant then took the victim's body and dumped it in a secluded area in Wayne County.[1]

Later that day, March 31, 1987, the appellant saw a local television newscast which reported the discovery of the victim's body. The appellant called the state police to report that he had information concerning the body. A Huntington police officer

---

1. Testimony at trial indicated that the appellant, following the homicide, had made statements to his friends. One of his friends testified that the appellant told him and another friend that he, the appellant, had caught the victim stealing something from his apartment, so he threw the victim out. The victim returned to the apartment, a struggle ensued, and the homicide occurred. In this version as well, the appellant maintained that he exercised self-defense in the struggle.

then went to the appellant's apartment and took the appellant to the police station. The appellant was advised of his *Miranda* rights. The appellant informed the Huntington police officer as to what the appellant contended happened. The appellant was questioned further after arriving at the police station. A tape-recorded confession was obtained from the appellant.

A post-mortem examination was performed on the victim on April 1, 1987, by Dr. Irvin M. Sopher, the state's chief medical examiner. This examination revealed that the victim's death was caused by "ligature strangulation," which is strangulation by the placing of an object around the neck. The examination also revealed an earring in the victim's vagina, although there was no evidence that sexual activity had taken place. The victim's blood alcohol level was .24 percent.

The appellant did not testify in this case.

## II. THE EARRING ISSUE

The primary issue in this case concerns testimony offered at trial dealing with the earring found in the victim. The appellant contends that the circuit court committed reversible error by allowing Dr. Sopher, a witness for the State, to testify as to the appellant's psychosexual motivation to kill the victim, based upon the finding of the earring, as well as its location in the victim.

During a pretrial deposition, Dr. Sopher stated that he was in no position to comment on the appellant's motive in regard to the significance, if any, of the earring. However, during that pretrial deposition, Dr. Sopher stated that "a sexual motive or sex-related death is something that has to be strongly considered" in this case, due to the earring's location in the victim. During the trial, as part of the State's case-in-chief, Dr. Sopher testified, based upon his post-mortem examination, that the cause of death was ligature strangulation. Dr. Sopher also testified that the post-mortem examination revealed the earring in the victim's vagina. However, during the State's case-in-chief, no testimony was elicited regarding whether this case involved a psychosexual homicide.

As part of the appellant's case-in-chief, Dr. Cyril Wecht, an expert in forensic pathology, was called to testify as to the appellant's theory of the cause of the victim's death. Dr. Wecht testified that the victim's death was caused by asphyxiation and inadequate blood supply to the brain. The direct examination of Dr. Wecht revealed that Dr. Wecht had reviewed the post-mortem report, based upon the autopsy performed by Dr. Sopher. While Dr. Wecht, on direct examination, did not specifically refer to the earring or its location, he did testify, in a sudden shift in the line of inquiry, that there were no findings that would lead him to believe that "sexual activity" was involved in this case.

On cross-examination of Dr. Wecht, the State inquired as to the possible significance of the earring. Dr. Wecht testified that in this case, he found no significance surrounding the earring.[2] The appellant did not object to this testimony elicited by the State.

Dr. Sopher again took the stand during the State's rebuttal. He testified that he not only attached significance to the earring, but the earring, in his opinion, was the "whole basis" of the homicide. The

---

2. Prior to the presentation of evidence, the appellant moved in limine to exclude portions of the post-mortem report, specifically, those findings that revealed the earring in the victim. In support of his motion, the appellant observed that there would be no evidence to connect the appellant with the earring. For example, at trial, a fingerprint specialist for the Huntington Police Department testified that the earring was suitable for fingerprinting, yet, it was not tested for prints to determine if the appellant had any connection with it. The appellant's motion in limine was denied by the circuit court. The appellant maintains that the earring should have been excluded under *W.Va.R.Evid.* 403, which provides, in part, that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" The appellant asserts that its probative value is outweighed by the danger of unfair prejudice. In this case, the earring, as well as the testimony by which it was accompanied, is relevant, and, for reasons set forth in this opinion, its probative value outweighs any danger of unfair prejudice.

following transpired during the State's rebuttal:

Q [by prosecutor] Dr. Wecht also attached no significance to the earring, do you agree or disagree with that?

A [Dr. Sopher] The earring is the whole basis, in my opinion, as to why this death occurred. You know, this earring didn't just happen to reside or be placed by accident into the vagina. . . . It could have not reached that location of the body without being intentionally placed in that location.

This *type of death* from the very outset is one of what we call a psychosexual homicide. That data is derived from the fact that you're dealing with a woman who had a vocation of prostitution. It's based upon the fact that the defendant in this particular case was not known to frequent these types of bars in the usual course of events, but on this particular night in question he struck up a relationship with Mrs. Sandra Chapman, took her home to his apartment, and in the ensuing events the murder of Mrs. Chapman occurred.

In the aftermath of this ligature strangulation the earring was found within the vaginal canal, this was not placed there, in my opinion, by Mrs. Chapman. There's no woman who would place a foreign object of this nature within her vaginal canal, I've not seen it in *many, many autopsies upon prostitutes.* Have not known or read about such a practice within my studies of forensic pathology, but on the other hand we see in many cases, especially of a sexual nature, whereby a foreign object is placed in the vagina by the assailant after death. It is a means of degradating [sic], denigrating and desecrating the female sex in general, if not the actual person who's been murdered. That is, it is a direct attack upon female sexuality with the genital organs representing deceit of female sexuality.

The background of this particular homicide, in my opinion, hinges only within the mind of the defendant who committed this crime and it is a psychosexual *type of homicide* that may have been triggered off either as a premeditated *type of murder* of an individual who has extreme negative feelings about women in general, possibly centered upon prostitutes. As another alternative it may, that is the theory behind this *type of murder,* may be based upon a person's individual background as to his own origin, birth, feelings about his own mother, perhaps, and thirdly, there may be as simple an explanation as having a person of some doubts as to their own sexuality and being unable to perform in a certain setting—

MR. STOLZE [defense counsel]: Your Honor, may I interpose an objection here. May we approach the bench?

Trial tr. 652–54 (emphasis supplied).

Appellant's counsel supported his objection to Dr. Sopher's testimony by arguing that because Dr. Sopher is not trained in psychiatry or psychology, he is not qualified to testify as to the appellant's psychological behavior. The appellant's objection was overruled. Dr. Sopher continued:

Q Doctor, you were discussing the significance of the earring in your opinion, would you continue in that discussion?

A Yes, we mentioned the possibility of premeditation in terms of the murder in searching out a prostitute for whatever reason. We talked about conversation between the assailant and the decedent that may have aroused extreme emotional feelings on the part of the assailant of a sexual nature and, thirdly, it may be as simple as a matter of a lack of adequate performance on the part of the assailant to, when chided by the female partner, reacted in a hostile manner resulting in the homicide and then the placement of this object in the vaginal canal. A psychosexual *type of homicide.*

Trial tr. 660–61 (emphasis supplied).

In this case, it is necessary to determine whether Dr. Sopher's opinion testimony was proper.[3]

**3.** Rule 704 of the *West Virginia Rules of Evi-* *dence* provides that "[t]estimony in the form of

The record in this case clearly reflects that it was the *appellant* who raised the issue of the sexual implications of this homicide. As stated previously in this opinion, the *direct* examination of Dr. Wecht, by the appellant, revealed that Dr. Wecht had reviewed the post-mortem report. This report included the finding of the earring in the victim. Furthermore, on direct examination of Dr. Wecht, the *appellant* attempted to ascertain whether there were findings that would lead Dr. Wecht to believe that sexual activity was involved in this case.

Because the appellant raised these issues as part of his case-in-chief through the direct examination of Dr. Wecht, obviously the State pursued this line of questioning during the cross-examination of Dr. Wecht. *See W.Va.R.Evid.* 611(b). "Normally, the scope of cross-examination [of a nonparty witness] is limited to the subject matter or issues or events to which the witness testified on direct examination. *The subject matter of direct [examination] does not mean literally the precise facts developed on direct.* It means the subject matter opened up[.]" F. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 3.3(D)(3) (2d ed. 1986) (emphasis supplied).

Consequently, Dr. Sopher's testimony, which rebutted the testimony of Dr. Wecht, was proper. "The admissibility of evidence as rebuttal is within the sound discretion of the trial court, and the exercise of such discretion does not constitute

ground for reversal unless it is prejudicial to the defendant." Syl.pt. 4, *State v. Blankenship*, 137 W.Va. 1, 69 S.E.2d 398 (1952), *overruled on another point, State v. McAboy*, 160 W.Va. 497, 498 n. 1, 236 S.E.2d 431, 432 n. 1 (1977). *Accord*, syl. pt. 4, *State v. Massey*, 178 W.Va. 427, 359 S.E.2d 865 (1987); syl. pt. 4, *State v. Peyatt*, 173 W.Va. 317, 315 S.E.2d 574 (1983); *see also State v. Oldaker*, 172 W.Va. 258, 264, 304 S.E.2d 843, 849 (1983). *Cf.* syl. pt. 2, *State v. Fitzsimmons*, 137 W.Va. 585, 73 S.E.2d 136 (1952) ("Whether the State in a criminal proceeding may introduce *further evidence* after a defendant has rested his case is a matter within the sound discretion of the trial court, and the exercise of that discretion will rarely be cause for reversal.") (emphasis supplied)

It has been held that the prosecution may recall one of its own witnesses to rebut a material issue *raised by the defendant.* "Since this line of inquiry was opened up on cross-examination initially by the defense and by the defense's own witnesses, the remainder of these matters were properly allowed in evidence by the State in rebuttal." *Thompson v. State*, 347 So.2d 1384, 1388 (Ala.Crim.App.), *cert. denied*, 347 So.2d 1388 (Ala.1977). *See also People v. Mazoros*, 76 Cal.App.3d 32, 43, 142 Cal.Rptr. 599, 606 (1977).

Similarly, we hold that where a criminal defendant's witness on direct examination raises a material matter, and on cross-examination testifies adversely to the prosecution, it is proper for the trial court to allow the prosecution to present rebuttal evidence as to such matter.

an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact." Subdivision (b) of Rule 704 of the *Federal Rules of Evidence* provides:

(b) No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

Subdivision (a) of Federal Rule 704 is virtually the same as Rule 704 of the *West Virginia Rules of Evidence.*

*W.Va.R.Evid.* 704 initially provided for a subdivision (b) like its federal counterpart when the state rules became effective on February 1, 1985. However, subdivision (b) of the state rule was repealed by an amendment effective on October 16, 1985. *See State v. Swiger*, 175 W.Va. 578, 588 n. 10, 336 S.E.2d 541, 551 n. 10 (1985). *See also State v. Smith*, 178 W.Va. 104, 107–108 n. 1, 358 S.E.2d 188, 191 n. 1 (1987).

In this case Dr. Sopher was recalled during the State's rebuttal in order to rebut the adverse testimony of the appellant's own witness, whose testimony, on direct examination, raised the issue of the sexual implications of this case. The circuit court did not commit reversible error by allowing the State to present this rebuttal testimony.

 As he contended at trial, the appellant now contends that Dr. Sopher, as an expert medical witness, was not qualified to testify as to the appellant's alleged psychological motive in this homicide. Ordinarily, we are disinclined to disturb a trial court's decision as to whether a witness is qualified to testify. "Whether a witness is qualified to state an opinion is a matter which rests within the discretion of the trial court and its ruling on that point will not ordinarily be disturbed unless it clearly appears that its discretion has been abused." Syl.pt. 5, *Overton v. Fields*, 145 W.Va. 797, 117 S.E.2d 598 (1960). *Accord*, syl. pt. 8, *Moore, Kelly & Reddish, Inc. v. Shannondale, Inc.*, 152 W.Va. 549, 165 S.E.2d 113 (1968).

*West Virginia Rules of Evidence* 702 provides:

> *Testimony by Experts.* If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

The purpose of expert opinion testimony is to allow witnesses possessing the requisite training, skill, or knowledge in a particular area to enlighten the fact finder. *See Jones v. Johnston Testers, Inc.*, 132 Cal. App.2d 162, 170, 281 P.2d 602, 607 (1955), *hearing denied* (Cal. June 2, 1955); *Phillips v. Delaware Power & Light Co.*, 59 Del. 179, 184, 216 A.2d 281, 284 (1966); *Kunzman v. Cherokee Silo Co.*, 253 Iowa 885, 890, 114 N.W.2d 534, 537 (1962); *Metropolitan Ice Cream Co. v. Union Mutual Fire Insurance Co.*, 358 Mo. 727, 733, 216 S.W.2d 464, 466–67 (1949) (en banc). *See*

*also McCormick on Evidence* § 13 (E. Cleary 3d ed. 1984); 31A Am.Jur.2d *Expert and Opinion Evidence* §§ 32–33 (1989).

More specifically, it has been held that:

> The qualification of a person to testify as an expert witness is a matter within the sound discretion of the trial court; and its determination, in the absence of a clear abuse, will not be disturbed by a reviewing court. *For one to be competent to testify as an expert he must have acquired such special knowledge of the subject matter about which he is to testify, either by study or by practical experience*, that he can give the trier of fact assistance and guidance in solving a problem for which his own good judgment and average knowledge is inadequate. Where the witness discloses special knowledge of the subject on which he undertakes to give his opinion as an expert, the question of the degree of his knowledge goes to the weight of his testimony rather than to its admissibility.

*People v. Mack*, 169 Cal.App.2d 825, 830–31, 338 P.2d 25, 29 (1959) (citations omitted) (emphasis supplied), *hearing denied* (Cal. June 18, 1959). *See* F. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 7.1(B) (2d ed. 1986).

Courts have allowed forensic pathologists to testify about the manner and mode of death in homicide cases. P. Giannelli & E. Imwinkelried, *Scientific Evidence* § 19–10(B), at 752 (1986). *See also* A. Moenssens, F. Inbau, & J. Starrs, *Scientific Evidence in Criminal Cases* § 5.11 (3d ed. 1986). *Cf.* syl. pt. 5, *State v. Jackson*, 171 W.Va. 329, 298 S.E.2d 866 (1982) (qualified physician may give opinion as to medical cause of death based on autopsy report); *State v. Clark*, 171 W.Va. 74, 78, 297 S.E.2d 849, 853 (1982) (medical examiner may give opinion as to physical and medical cause of death); *State v. Noe*, 160 W.Va. 10, 16–17, 230 S.E.2d 826, 830 (1976) (pathologist not permitted to give opinion on whether sexual activity was "attempted"

with homicide victim where he had admitted there was no evidence of sexual intercourse) (each decided prior to adoption of *W.Va.R.Evid.* 704, *see supra* note 3).

Specifically, New York's highest court has allowed a professor of pathology to testify in a homicide case that the victims' wounds were not the result of a "maniacal" stabbing. *People v. Smith*, 59 N.Y.2d 156, 464 N.Y.S.2d 399, 451 N.E.2d 157 (1983). There, the court relied on the fact that the testifying pathologist had been involved in numerous autopsies and therefore could testify about the nature of the attack in that case. *Id.* at 168, 464 N.Y.S.2d at 405, 451 N.E.2d at 163. The testimony of the pathologist in that case, the court held, did not go primarily to the defendant's state of mind. *Id.*

Similarly, in this case, Dr. Sopher's rebuttal testimony, which was critical to the State's case in light of the appellant's self-defense theory, went to the type of homicide involved in this case. Dr. Sopher testified that the homicide in this case was of a psychosexual type, based upon finding the earring in the victim's vagina.

As indicated by the testimony in question, Dr. Sopher has performed numerous autopsies upon prostitutes. In this case, there was evidence that the victim was a prostitute. During the arguments over the appellant's objection to Dr. Sopher's testimony, Dr. Sopher testified as to his credentials in forensic pathology and that in his field he must draw conclusions on the psychological profile of assailants regularly and provide this information to law enforcement agencies. Counsel for the appellant cross-examined Dr. Sopher on his credentials and qualifications to state an opinion in this case.[4] The circuit court, having all of this before it, overruled the appellant's objection to Dr. Sopher's testimony.

In a homicide case a medical examiner may be qualified to state an opinion as to whether the homicide was of a psychosexual type. Such qualification should be based upon the medical examiner's: post-mortem examination or a review of the report thereof; knowledge of psychosexual types of homicide; and experience in post-mortem examinations upon similarly situated victims. Whether a medical examiner is qualified in this regard is a determination to be made by the trial court and, unless the trial court has abused its discretion, this Court will not disturb the trial court's ruling. The circuit court's ruling in this regard was not an abuse of discretion.[5]

## III. TESTIMONY REGARDING VICTIM'S CHARACTER

The appellant contends that the circuit court committed reversible error by excluding the proffered testimony of Dr.

---

4. The circuit court instructed the jury on the role of expert witnesses and that the jury may give expert testimony such weight and value as the jury may determine.

5. The appellant contends that Dr. Sopher's testimony should not have been admitted because this Court has previously held: "The general rule is that expert opinion cannot be offered as to the subjective intent of an individual." Syl. pt. 3, *State v. Mitter*, 168 W.Va. 531, 285 S.E.2d 376 (1981). We do not agree with this contention. Assuming, without deciding, the continuing validity of *Mitter* in light of *W.Va.R.Evid.* 704, *see supra* note 3, *Mitter* is not applicable here because Dr. Sopher's testimony did not go to the appellant's subjective intent, but, rather, to the type of homicide in this case. We leave to another day the question of the scope of Rule 704.

The appellant also contends that prosecutorial misconduct was committed through the use of surprise tactics by Dr. Sopher's rebuttal testimony. In light of our holding and discussion concerning who *raised* the issue of the sexual implications of the case, it is clear that the appellant was not surprised by evidence adduced by the prosecution.

We are concerned, however, with Dr. Sopher's testimony on redirect examination by the State, during its case-in-chief, that the absence of evidence of sexual activity could be explained by the possibility that the appellant wore a condom. It was this very hypothetical that we cautioned the use of in *State v. McPherson*, 179 W.Va. 612, 618 n. 11, 371 S.E.2d 333, 339 n. 11 (1988). However, under all of the circumstances in the trial of this case, the appellant was not prejudiced by this remark.

Melvin A. Gravitz, a clinical psychologist from Washington, D.C., and refusing to admit certain testimony of Dr. Wecht. Both had testimony to offer concerning their opinion, based upon medical records, as to the victim's reputation for aggressive behavior, so as to corroborate the appellant's theory of self-defense.[6]

West Virginia Rules of Evidence 404(a)(2) provides:

(a) *Character Evidence Generally.*— Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

. . . .

(2) Character of Victim of a Crime Other than a Sexual Conduct Crime.— Evidence of a pertinent trait of character of the victim of the crime, other than a crime consisting of sexual misconduct, offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor[.]

Recently, in syllabus point 2 of *State v. Woodson,* 181 W.Va. 325, 382 S.E.2d 519 (1989), we recognized that:

Rule 404(a)(2) of the West Virginia Rules of Evidence essentially codifies the common[-]law rules on the admission of character evidence of the victim of a crime. In particular, under our traditional rule, a defendant in a homicide, malicious wounding, or assault case, who relies on self-defense or provocation, may introduce evidence concerning the violent or turbulent character of the victim, including prior threats or attacks on the defendant. This is reflected by Syllabus Point 2 of *State v. Louk,* 171 W.Va. 639, 301 S.E.2d 596 (1983):

'In a prosecution for murder, where self-defense is relied upon to excuse the homicide, and there is evidence showing, or tending to show, that the deceased was at the time of the killing, making a murderous attack upon the defendant, it is competent for the defense to prove the character or reputation of the deceased as a dangerous and quarrelsome man, and also to prove prior attacks made by the deceased upon him, as well as threats made to other parties against him; and,

---

6. The record in this case has not been developed to indicate how persistent the appellant's attempts were to admit the testimony of Dr. Gravitz. However, the circuit court clearly refused to allow Dr. Wecht to testify as to the victim's reputation for aggressive behavior.

The appellant asserts that evidence of the victim's aggressive character was sought to be introduced in order to show that the victim was the aggressor on the night of the homicide, thus supporting the appellant's theory of self-defense. However, the record fails to establish the harm caused by the circuit court's exclusion of evidence attempting to show that the victim was the aggressor. As pointed out, the record is not complete as to the appellant's attempts to introduce Dr. Gravitz's testimony. When the appellant attempted to introduce Dr. Wecht's testimony in this regard, the circuit court did not allow such testimony. Significantly, the medical and psychological reports upon which Dr. Wecht would have based his opinion are not in the record, and, therefore, it is not possible for this Court to determine whether the appellant was prejudiced.

Typically, when the accused attempts to prove that the victim was the aggressor, such proof is established by introduction of "evidence of [the victim's] reputation in that respect and by witnesses who can testify from an actual knowledge of the victim's character." *State v. Jacoby,* 260 N.W.2d 828, 837 (Iowa 1977). We are not willing to extend recognition of this principle to this case, where a medical expert witness' testimony would have been based upon a review of medical and psychological reports which are not a part of the appellate record and which may or may not indicate the victim's aggressive character.

Indeed, some courts have recognized that evidence of the victim's aggressive character is admissible for the purpose of proving who was the aggressor, even if the victim's character was unknown to the accused. This is distinguishable from the situation where the accused is merely attempting to prove a reasonable apprehension of danger, in which case, in order for the victim's character evidence to be admissible, such evidence must be known to the accused. *See, e.g., Jacoby,* 260 N.W.2d at 837.

if the defendant has knowledge of specific acts of violence by the deceased against other parties, he should be allowed to give evidence thereof.' (Citations omitted).

Stated another way, it has been recognized in other jurisdictions as well that it is proper for a trial court to exclude testimony relating to the reputation for aggressiveness and character for violence of the victim in a homicide case where the defendant claims reasonable apprehension of danger, but where the defendant had no prior knowledge of such reputation at the time of the homicide. *Burnett v. State*, 380 So.2d 1021, 1022 (Ala.Crim.App.1980); *Banks v. State*, 351 So.2d 1071, 1072 (Fla. Dist.Ct.App.), *cert. denied*, 354 So.2d 986 (Fla.1977); *State v. Lui*, 61 Haw. 328, 331, 603 P.2d 151, 154 (1979); *People v. Buchanan*, 91 Ill.App.3d 13, 15–16, 46 Ill.Dec. 540, 542–43, 414 N.E.2d 262, 264–65 (1980); *State v. Jacoby*, 260 N.W.2d 828, 837 (Iowa 1977); *State v. Bernard*, 358 So.2d 1268, 1270 (La.1978); *State v. Taylor*, 258 N.W.2d 615, 620–21 (Minn.1977); *State v. Howard*, 564 S.W.2d 71, 76 (Mo.Ct.App. 1978).

In syllabus point 3 of *Woodson*, we held that:

Under Rule 405(b) of the West Virginia Rules of Evidence, a defendant in a criminal case who relies on self-defense or provocation may introduce specific acts of violence or threats made against him by the victim and, *if the defendant has knowledge of specific acts of violence against third parties by the victim, the defendant may offer such evidence.*

(emphasis supplied) *See also* syl. pt. 2, *State v. Peoples*, 106 W.Va. 262, 145 S.E. 389 (1928).[7]

In this case, there is no evidence that the appellant knew the victim prior to the early morning hours of March 31, 1987, at which time the homicide occurred. Consequently, there is no evidence that the appellant had knowledge of the victim's reputation for aggressiveness.

" 'Rulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion.' " Syl. pt. 2, *State v. Peyatt*, 173 W.Va. 317, 315 S.E.2d 574 (1983) (quoting *State v. Louk*, 171 W.Va. 639, 643, 301 S.E.2d 596, 599 (1983)). *See* syl. pt. 5, *Grillis v. Monongahela Power Co.*, 176 W.Va. 662, 346 S.E.2d 812 (1986); syl. pt. 5, *Casto v. Martin*, 159 W.Va. 761, 230 S.E.2d 722 (1976); syl. pt. 10, *State v. Huffman*, 141 W.Va. 55, 87 S.E.2d 541 (1955); F. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 1.8(B) (2d ed.1986).

This holding was restated after adoption of the *West Virginia Rules of Evidence* in syllabus point 5 of *State v. Haught*, 179 W.Va. 557, 371 S.E.2d 54 (1988).

In this case there is nothing in the record which demonstrates that the circuit court abused its discretion by refusing to admit testimony of the victim's reputation for aggressive behavior. Therefore, the circuit court did not commit reversible error in this regard.

## IV. CONDUCT OF *VOIR DIRE*

The appellant also contends that the circuit court's conduct of *voir dire* constitutes reversible error. In so contending, the appellant points out statements made by the circuit court during *voir dire* by which the appellant contends he was prejudiced, as

---

7. *W.Va.R.Evid.* 405 provides:

*Methods of Proving Character.* (a) *Reputation or Opinion.*—In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

(b) *Specific Instances of Conduct.*—In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct.

well as questions asked of the jury by the circuit court during *voir dire.*

■ First, we address the statements of the circuit court.[8] During *voir dire,* the circuit court stated that the appellant, in claiming self-defense, "will state that the decedent did threaten to attack and attacked him in such a way[.]" The appellant maintains that the jury could have inferred from this statement that the appellant would take the stand. Therefore, the appellant argues that this statement, in effect, compelled him to do so, thereby surrendering the appellant's constitutional right not to take the stand.[9] The appellant claims that the circuit court erred by not declaring a mistrial after the circuit court stated that it would do so if the appellant did not testify.

■ The appellant's counsel did *not* call the appellant as a witness. There is nothing in the *record* to indicate that the appellant was not called in reliance upon the circuit court's statement during *voir dire.* On this record, it is equally plausible that the appellant was not called as a witness for tactical reasons, for example, to preclude cross-examination of the appellant. In light of this, it would not have been error for the circuit court to fail to grant a mistrial at the conclusion of the appellant's case, if the reason the appellant did not testify was due to tactical reasons. Therefore, there is no error apparent on the record in this case. "This Court will not consider an error which is not preserved in the record nor apparent on the face of the record." Syl. pt. 6, *State v. Byers,* 159 W.Va. 596, 224 S.E.2d 726

(1976). Obviously, a mistrial should be granted only if there are grounds for such and if those grounds are apparent.[10]

Moreover, "[t]he purpose of voir dire is to safeguard the rights of a defendant to have the jury composed of persons who have no interest in the case, have neither formed nor expressed any opinion, are free from bias or prejudice and stand indifferent in the case." 1 F. Cleckley, *Handbook on West Virginia Criminal Procedure* 626 (1985). The circuit court's statement did not impede the purpose of *voir dire,* which is to safeguard the rights of the defendant. This is especially true in light of the circuit court's instruction to the jury that the appellant's "failure to testify is not a circumstance which the jury is entitled to consider." Furthermore, the circuit court gave several instructions on self-defense, and the appellant's own witnesses testified as to the appellant's theory of self-defense.

Also during *voir dire,* the circuit court inquired as to whether the prospective jurors would feel "uncomfortable" returning a "not guilty" verdict if the appellant acted in self-defense. The appellant intimates that the questions he proposed to the circuit court for *voir dire,* but which were rejected, would have avoided any prejudice. Primarily, the appellant desired *voir dire* questions which focused on the area of self-defense. The appellant also desired a question regarding the role of an expert witness.[11] We have reviewed the circuit court's questions as well as the appellant's proposed questions. It is clear to us that the appellant was not prejudiced by the content of the circuit court's questions.

---

8. During *voir dire,* the circuit court advised the jury panel that it had before it a "case involving very explicit sexual activity." After a conference at the bench, the circuit court clarified its statement, advising the jury panel that sexual activity is not necessarily involved in this case, but may be inferred from the evidence presented during trial. As discussed previously, there was evidence before the jury as to the sexual implications of the case.

9. *See U.S. Const.* amend. V; *W.Va. Const.* art. III, § 5.

10. It is equally obvious that gratuitous comments made by a trial court to the effect that it will grant a mistrial are not binding unless grounds are shown for a mistrial.

11. The circuit court instructed the jury on the role of expert witnesses and how the testimony

This Court has held that "[i]n a criminal case, the inquiry made of a jury on its *voir dire* is within the sound discretion of the trial court and not subject to review, except when the discretion is clearly abused." Syl. pt. 2, *State v. Beacraft*, 126 W.Va. 895, 30 S.E.2d 541 (1944), *overruled on another point*, syl. pt. 8, *State v. Dolin*, 176 W.Va. 688, 347 S.E.2d 208 (1986). *Accord*, syl. pt. 2, *State v. Mayle*, 178 W.Va. 26, 357 S.E.2d 219 (1987).

In *State v. Simmons*, 172 W.Va. 590, 601, 309 S.E.2d 89, 100 (1983), we found no error in the trial court's rejection of some of the defendant's proposed *voir dire* questions because they were substantially covered by other questions used in the *voir dire*. *See* syl. pt. 4, *State v. McFarland*, 175 W.Va. 205, 332 S.E.2d 217 (1985).

Consistent with the foregoing, we hold that in a criminal case the trial court's conduct of the *voir dire* is not reversible error if it is conducted in a manner which safeguards the right of a defendant to be tried by a jury free of bias and prejudice. Accordingly, it is not reversible error in a criminal case for a trial court to refuse to ask questions submitted for *voir dire* by the defendant if such questions are substantially covered by other questions asked by the trial court.

Therefore, there was no error on the part of the circuit court with regard to the conduct of *voir dire* in this case.

## V. TAPE–RECORDED CONFESSION

As stated in section I of this opinion, a tape-recorded confession was obtained from the appellant at the police station.[12] The appellant contends that the circuit court committed reversible error by allowing the jury to take the tape-recorded confession to the jury room for replay during deliberations. The circuit court also allowed a transcript of the tape to be taken into the jury room.

This Court has never ruled upon whether it is reversible error in a criminal case for a trial court to allow a written statement containing a defendant's confession or incriminating admission, or a tape recording containing the same, to be taken into the jury room. More generally, though, we have held that

> [t]he jury, during deliberations, may use an exhibit, admitted into evidence, according to its nature and within the bounds of the evidence at trial in order to aid the jury in weighing the evidence, and the jury may make a more critical examination of an exhibit than was made during the trial.

Syl. pt. 6, *State v. Armstrong*, 179 W.Va. 435, 369 S.E.2d 870 (1988). Likewise, *West Virginia Rules of Criminal Procedure* 30 provides that a trial court, after instructing the jury, "may show the written instructions to the jury and permit the jury to take the written instructions to the jury room."

Several courts have permitted tape recordings which contain confessions and incriminating statements to be taken into the jury room during deliberations. *State v. Triplett*, 248 Iowa 339, 348–49, 79 N.W.2d 391, 397 (1956), *cert. granted*, 355 U.S. 811, 78 S.Ct. 64, 2 L.Ed.2d 30 (1957), *cert. dismissed as improvidently granted*, 357 U.S. 217, 78 S.Ct. 1358, 2 L.Ed.2d 1361 (1958); *State v. Poulos*, 230 Kan. 512, 514, 639 P.2d 477, 479 (1982); *State v. Barbo*, 339 N.W.2d 905, 906 (Minn.1983); *State v.*

of an expert witness is to be considered. *See supra* note 4.

**12.** The appellant contends that the circuit court committed reversible error by failing to suppress the taped confession. In so contending, the appellant asserts that there was an improper delay used to extract a separate confession. Our review of the record reveals no error on the part of the circuit court in this regard. Contrary to the appellant's assertion, there was no improper delay in this case used to extract a separate confession, and proper warnings were administered. *See* syl. pt. 2, *State v. Bennett*, 176 W.Va. 1, 339 S.E.2d 213 (1985).

*Fried*, 92 N.M. 202, 203–04, 585 P.2d 647, 648–49 (Ct.App.), *cert. denied*, 92 N.M. 260, 586 P.2d 1089 (1978).

Relatedly, other courts have permitted the transcripts of such tape recordings to be taken into the jury room. *Rhames v. State*, 473 So.2d 724, 726 (Fla.Dist.Ct.App. 1985), *review denied*, 494 So.2d 205 (Fla. 1986); *State v. Ahmadjian*, 438 A.2d 1070, 1082 (R.I.1981).

Written confessions and transcripts of testimony containing confessions and incriminating statements have also been allowed by several courts to go into the jury room during deliberations. *Manning v. State*, 217 Ala. 357, 360–61, 116 So. 360, 363 (1928); *State v. Castelli*, 92 Conn. 58, 69, 101 A. 476, 480 (1917); *Parks v. State*, 254 Ga. 403, 406, 330 S.E.2d 686, 690–91 (1985); *People v. Caldwell*, 79 Ill.App.2d 273, 285–86, 224 N.E.2d 634, 640 (1967), *aff'd*, 39 Ill.2d 346, 356–59, 236 N.E.2d 706, 712–14 (1968); *State v. Hale*, 371 S.W.2d 249, 257 (Mo.1963); *State v. Doty*, 94 Ohio St. 258, 266–67, 113 N.E. 811, 813–14 (1916); *Commonwealth v. Schwartz*, 178 Pa.Super. 434, 444–45, 115 A.2d 826, 831

(1955); *Kizzee v. State*, 166 Tex.Crim. 191, 194, 312 S.W.2d 661, 664 (1958).

Other physical evidence containing incriminating admissions have also been permitted entry into the jury room. *People v. Stanard*, 224 Mich. 166, 170, 194 N.W. 507, 508 (1923) (copy of receipt allowed to go into jury room); *Territory v. Doyle*, 7 Mont. 245, 249, 14 P. 671, 672 (1887) (account book allowed to be inspected by jury in jury room); *State v. Wetherell*, 70 Vt. 274, 275, 40 A. 728, 728 (1898) (written letters allowed to be examined by jury during deliberations).[13]

■ Accordingly, we join these jurisdictions in holding that in a criminal case it is not reversible error for a trial court to allow a document, such as a transcript, a written statement, or a tape recording, which contains a confession or incriminating statement, and which has already been admitted into evidence, to be taken into the jury room for the jury's use during deliberations.

Therefore, the circuit court, by allowing the appellant's tape-recorded confession to go into the jury room, did not commit reversible error.[14]

---

**13.** Some federal circuits have given their approval to allowing such evidence into the jury room during deliberations. *United States v. Carson*, 464 F.2d 424, 437 (2d Cir.), *cert. denied*, 409 U.S. 949, 93 S.Ct. 268, 34 L.Ed.2d 219 (1972); *Sears v. United States*, 343 F.2d 139, 144 (5th Cir.1965); *United States v. Samples*, 713 F.2d 298, 303 (7th Cir.1983); *Chavira Gonzales v. United States*, 314 F.2d 750, 752 (9th Cir. 1963). Our research has revealed that no federal circuits have specifically barred such evidence from being taken into the jury room during deliberations. *See generally* annotation, *Permitting Documents or Tape Recordings Containing Confessions of Guilt or Incriminating Admissions to Be Taken Into Jury Room in Criminal Case*, 37 A.L.R.3d 238 (1971 & Supp.1989).

**14.** The appellant relies upon a Wisconsin decision, wherein that state's highest court disapproved the practice of sending a tape recording of the defendant's confession into the jury room for two reasons: (1) such practice risks accidental erasure or breaking of the tape when it is not under the court's supervision; and (2) such practice presents a danger in that it may over-

emphasize the confession in relation to testimony given from the witness stand. *Franklin v. State*, 74 Wis.2d 717, 724–25, 247 N.W.2d 721, 725 (1976). However, in that case, the court held that the trial court, exercising its discretion, could allow the defendant's taped confession to be replayed in the courtroom, under the trial court's supervision. *Id.* at 725, 247 N.W.2d at 725.

Any evidence admitted during trial and permitted entry into the jury room carries with it the risk of being damaged and, consequently, not being in the same condition as it was when admitted into evidence. In this respect, a tape-recorded confession is no different from any other physical evidence which is allowed to go into the jury room during deliberations. Furthermore, we fail to see the logic of the Wisconsin court's second concern, that the defendant may be prejudiced by overemphasis of the tape-recorded confession. Certainly, by allowing the jury to hear the tape-recorded confession in the courtroom, under the trial court's supervision, the defendant is subject to the same degree of risk of prejudice.

VI. CONCLUSION

Affirmed.

Based upon all of the foregoing, the appellant's conviction is affirmed.[15]

---

**15.** The appellant assigns and briefs other errors on the part of the circuit court that are without merit for reasons stated below.

The appellant contends that the circuit court judge should have recused himself from presiding over the trial of this case and maintains that it was error for him not to do so. The appellant contends that the circuit court had a pro-prosecution bias. *See State ex rel. Green v. Dostert,* 172 W.Va. 222, 304 S.E.2d 675 (1983).

The appellant contends that the circuit court erred by excluding the testimony of an appellant's witness, an inmate at the Cabell County jail, who had mental disorders. This witness was to testify that he had observed a knife wound on the appellant's arm on the date the appellant was arrested and incarcerated, thus, supporting the appellant's self-defense theory. The circuit court ruled that this witness was not competent to testify. We find no error. *See* syl. pt. 8, *State v. Wilson,* 157 W.Va. 1036, 207 S.E.2d 174 (1974).

The appellant contends that prosecutorial misconduct occurred during the State's closing argument, especially with regard to the prosecutor's characterizations of the appellant. For example, the prosecutor described the appellant as a "liar," a "killer," and that "[s]ociety can't let people like Karl Dietz loose." We have recognized the impropriety of certain remarks made by a prosecutor. *State v. Hobbs,* 178 W.Va. 128, 132, 358 S.E.2d 212, 216 (1987). However, we find no error in this case because the prosecutor's remarks did not "clearly prejudice the accused or result in manifest injustice." *See* syl. pt. 5, *State v. Ocheltree,* 170 W.Va. 68, 289 S.E.2d 742 (1982).

The appellant also assigns as error the giving of certain instructions to the jury. The appellant challenges the giving of a first degree murder instruction, claiming that it is not supported by the evidence. We find no error. The evidence in this case was sufficient to convict the appellant of first degree murder, and, therefore, a first degree murder instruction was proper. *See* syl. pt. 8, *State v. Hall,* 171 W.Va. 212, 298 S.E.2d 246 (1982).

Finally, the appellant contends that the evidence in this case is insufficient to support a guilty verdict. In our judgment, the record in this case is replete with evidence sufficient to convict the appellant. We are not convinced that "the evidence was manifestly inadequate and that consequent injustice has been done." *See* syl. pt. 1, *State v. Starkey,* 161 W.Va. 517, 244 S.E.2d 219 (1978).